Staunton.

GROSH v. IVANHOE LAND & IMPROVEMENT CO., AND
ANOTHER.

SEPTEMBER 16, 1897.

1. RESCISSION—*Misrepresentations—Knowledge of Party Making—Facts
and Opinions.*—A false representation of a material fact constituting
an inducement to the contract, on which the party to whom it was
made had a right to rely, is ground for the rescission of the con-
tract, although the party making the representation was ignorant
whether it was true or false. It is immaterial whether the mis-
representation was made innocently, or knowing it to be false, if the
party to whom it was made believed it to be true, and was misled
by it in making the contract. But the misrepresentation must be
of an existing fact, and not the mere expression of an opinion.

2. FALSE REPRESENTATIONS—*Inference That They Were Relied Upon—
How Overcome—Burden of Proof.*—When the seller has made a false
representation, which, from its nature, might induce the buyer to
enter into the contract on the faith of it, it will be inferred that
the buyer was induced by it to contract, and the burden of proof
is not on him to show that he did rely upon such representation.
In order to overcome this inference the seller must prove either
that the buyer knew the representation to be untrue, or that he
expressly stated in terms, or showed by his contract, that he did
not rely upon the representation, but acted on his own judgment.
Nor is the buyer deprived of relief because he had the means of
discovering that the representation was false.

3. RESCISSION—*Laches.*—Whether a party seeking a rescission of his
contract has forfeited his right to it, by laches or misconduct, de-
pends upon the facts and circumstances of the particular case. If
the rights of creditors have intervened, or an innocent third party
has acquired an interest in the propery, or if, in consequence of
his delay, the position of even the wrong-doer is affected, the party
seeking rescission on the ground of fraud will be deemed to have
waived his right to rescind. But if the delay has not prejudiced

creditors, innocent third persons, nor the other party to the contract, and there has been no ratification of the contract by the party asking the rescission, relief should be afforded him.

Argued at Wytheville.    Decided at Staunton.

Appeal from a decree of the Circuit Court of Wythe county pronounced September 18, 1895, in a suit in chancery wherein the appellant was the complainant, and the appellees were the defendants.

*Reversed.*

The opinion states the case.

*H. M. Heuser* and *C. B. Thomas,* for the appellant.

*Walker & Caldwell,* for the appellees.

CARDWELL, J., delivered the opinion of the court.

This is a suit in equity, brought by H. E. Grosh against the Ivanhoe Land & Imp. Co. and M. M. Caldwell, Trustee, for the rescission of a contract entered into by the former with the Ivanhoe Land & Imp. Co. for the purchase of seven of its town lots in the plan of the town of Ivanhoe, Wythe county, Va.

The bill alleges that the defendant company issued its prospectus and otherwise extensively advertised the sale of its lots in 1890, and in these made certain promises and representations, unequivocally, as positive existing facts, in order to persuade and induce parties to purchase its lots at exorbitant prices; that these promises and representations were made by the authorized agents of the said company, as well as by its prospectus, posters, pamphlets, maps, newspaper advertisements, &c., &c.; and being influenced altogether by these promises, representations, and assurances of the defendant company, its authorized agent, &c., that the advantages, industries, and enterprises claimed for the town of Ivanhoe were actually *in esse,*

or secured, and in course of construction, as published and declared by it and them in the bold language employed in its prospectus, maps, advertisements, &c., (copies of which are made exhibits with the bill), and by reason of the proud manner in which the defendant company published the high sounding titles, the prominence, and the avocations of its directory, men known to occupy high social, business, and official positions, complainant was induced to buy seven of its lots at its own prices, between July and September, 1890; that of the gross price, $2,200, agreed to be paid for the seven lots, complainant paid $733.32 in cash, and gave his two notes in equal amounts for the balance, payable in one and two years from their date, with interest, and secured them by deed of trust on the lots, to M. M. Caldwell, trustee, the defendant company having conveyed the lots to complainant by its deed with general warranty of title; that the defendant company sold these lots to complainant under gross misrepresentations of material facts, which were made with that express purpose, and that the same were made either wilfully, intentionally, and fraudulently, to deceive complainant and others into purchasing defendant company's lots, or were made with such careless ignorance of others' rights, and with such a reckless disregard of the truth as amounts in law to a knowledge of their false and fraudulent character, &c.   Complainant prays for a rescission of his contract, a recovery of the purchase money paid, a cancellation of his notes and deed of trust, and offers to reconvey the lots to the defendant company. The defendant company demurred to and answered the bill, denying all fraud and unfair dealing, but admitting that it made the promises, representations, &c., contained in its prospectus, maps, advertisements, &c., made exhibits with the bill, and that the agent of the defendant company who sold the lots to the complainant, had the advertisement and map, exhibits "C" and "J," filed with the bill, in his possession at the time the sale to complainant was made, and was authorized to make the representations, &c., contained therein.

At the hearing, upon the bill and exhibits therewith, the demurrer and answer thereto, and the depositions taken for both complainant and defendant company, the Circuit Court overruled the demurrer, but dismissed the bill, with costs to the defendant company. From that decree this appeal was obtained.

The demurrer was properly overruled, as the bill clearly stated a case entitling complainant to the relief he asks, if sustained by the proof.

For the purposes of the case presented, we need only consider whether or not the representations, inducements, &c., made by the defendant company through its agent, to appellant, contained in the papers, exhibits "C" and "J" with the bill, were to induce him to enter into the contract he asks to have rescinded.

A false representation of a material fact constituting an inducement to the contract, on which the party had a right to rely, is a ground for rescission of the contract by a court of equity, although the party making the representation was ignorant whether it was true or false. The real enquiry is not whether the party making the representation knew it to be false, but whether the other party believed it to be true, and was misled by it in making the contract; and, whether the misrepresentation is made innocently or knowingly, the effect is the same.

No man is bound by a bargain into which he has been deceived by fraud or misrepresentation. Whenever a purchaser has been induced, by a material misrepresentation of the vendor, to buy, he has the right to repudiate the contract; a right correlative with that of the vendee to disaffirm the sale when he has been defrauded.

When the seller has made a false representation, which from its nature, might induce the buyer to enter into the contract on the faith of it, it will be inferred that the buyer was induced thereby to contract, and it does not rest with him to show that he, in fact, relied upon the representation. In order to displace this inference, the seller must prove either that the buyer had

knowledge of facts which showed the representation to be untrue, or that he expressly stated in terms, or showed by his contract, that he did not rely upon the representation, but acted upon his own judgment. Nor is the buyer deprived of his right to relief because he had the means of discovering that the representation was false.

There is little room, however, for controversy as to the law of the case, for it is too well settled by the decisions of this court in the cases from which the above quotations are made, and we need only refer to them:

*Max Meadows, &c., Co.* v. *Brady*, 92 Va. 71; *Wilson* v. *Carpenter*, 91 Va. 183; *McMullin* v. *Sanders*, 79 Va. 386; *Lowe* v. *Trundle*, 78 Va. 65, and cases cited.

Exhibit "C" is a copy of an advertisement of a private sale of the defendant company's lots in the plan of Ivanhoe, on July 16, 1890, at an average price of $275 per lot, which appeared in the Richmond Dispatch, a daily newspaper published in the city of Richmond, Va., first on Sunday, July 6, 1890. Exhibit "J" is a map of the town of Ivanhoe, as mapped out, and showing large reservations for manufacturing and mining purposes, a large park, extensive hotel grounds, depots, railroad lines, furnaces, numerous streets and avenues, and a great number of dwelling and business lots, the lots for dwellings having only a front of 25 feet, with a depth from 100 to 150 feet. These are admitted to have been presented to appellant at or before his purchases, and the representations contained therein, by authority of the defendant company made to him by its agent in the city of Richmond, where the contract was entered into.

The advertisement, exhibit "C," is headed:

"IVANHOE, WYTHE CO. VA. AT THE JUNCTION OF THE NORTH CAROLINA EXTENSION, AND CRIPPLE CREEK EXTENSION, OF THE NORFOLK AND WESTERN RAILROAD. A GREAT RAILROAD JUNCTION IN THE HEART OF THE GREATEST MINING DISTRICT OF SOUTHWEST VIRGINIA,

AND DESTINED SOON TO RANK WITH THE GREATEST IN-
DUSTRIAL CENTRES OF THE NEW SOUTH."

Among the many statements made therein, are the fol-
lowing:

"Immense limestone quarries already being operated within
the town.

"The No. 1 furnace of the New River Mineral Company is
already in successful operation, while the Ivanhoe Iron Com-
pany, under the presidency of Jordan L. Mott, of the Mott-
Haven Iron Works, of New York, has beeen organized for the
purpose of erecting another furnace of large capacity.

"The extensive mines (eight) of the New River Mineral Com-
pany, adjoining the town, are already giving employment to a
large number of men.

"The Ivanhoe Zinc Company, with a capital of $500,000, has
purchased immense deposits of valuable zinc ores, which they
are now developing, and will soon erect several large furnaces.

"Being the only city on this south connection of the N. &. W.
R. R., Ivanhoe has become the great distributing point for the
immense ore fields and agricutural and timber districts of South-
west Virginia and Western North Carolina.

"Situated in the midst of a great wool-growing district, and
within a short haul of the Southern cotton fields, no place in
Virginia possesses greater advantages for wooolen and cotton
mills.

"Through its connections with the steamship lines, the Louis-
ville and Nashville, the Shenandoah Valley, and the Cape Fear
and Yadkin Valley Railroads, and its outlet on the Ohio River,
the Norfolk and Western Railroad, places Ivanhoe in direct
communication with all the great markets of the North, South,
East and West."

From this advertisement, signed by the president and
secretary of the defendant company, it was reasonably
to be construed that Ivanhoe was at the junction of three rail-

roads, actually in existence and operation, connecting the N. & W. R. R., not only with the Cripple Creek Valley R .R., but with the Cape Fear and Yadkin Valley R. R., which passes through an extensive portion of North Carolina, including the cotton growing section, and having a terminus on the Atlantic Ocean, at Wilmington, N. C., and connnecting with other railroads extending to the cotton sections still further south, and to Western North Carolina: when, in point of fact, neither of these railroads connected with the N. & W. Railroad. The Cripple Creek Railroad extension spoken of had no existence in fact, and when exhibit "C" was published, Ivanhoe was the terminus of one branch of the N. & W. Railroad, with a few miles only south of it under construction or completed.

Not only had the N. & W. Railroad no connection with the Cape Fear & Y. V. Railroad in North Carolina, but, when this statement was published and shown appellant, as is admitted, the officers and directors of the defendant company, or some of them at least, necessarily knew that it was not an existing fact, and that the building of the line of railroad necessary to make this connection across the Blue Ridge mountains, thirty-five or forty miles, was by no means assured, or the statement was made so recklessly and so utterly in disregard of the real facts, easily within the reach of those making or authorizing the statement to be made, as to amount to a fraud upon persons thereby induced to purchase the lots of the defendant company at Ivanhoe.

The statement that Ivanhoe, "being the only city on this south connection of the N. & W. R. R., has become the great distributing point for the immense ore fields and agricultural and timber districts of Southwest Virginia and Western North Carolina," is a positive statement of an existing fact, not that Ivanhoe would become a city, and the great distributing point for the immense ores, &c., of Southwest Virginia and Western North Carolina, but was a city, and the only city upon this south connection, and had become the great distributing point, &c. A statement of a fact of great importance to purchasers

of town lots at Ivanhoe, but by no means authorized by its situation and surroundings.

As to the "immense limestone quarries already being operated within the town," it is not pretended now that they were independent industries, as a reader of exhibit "C" had every reason to believe, but were small affairs, operated mainly for quarrying limestone for use in the furnace, being operated by the New River Mineral Co. Not over $500 worth of the limestone quarried was sold for other purposes, and this to a railroad contractor who quarried it himself.

Instead of the New River Mineral Co. having, at that time, eight extensive iron mines in operation, the proof is, it was operating not over half that number.

It is also conclusively shown that the statement that the "Ivanhoe Iron Company, under the presidency of Jordan L. Mott, of the Mott-Haven Iron Works, of New York, has been organized for the purpose of erecting another furnace of large capacity," had no foundation in fact, as such a company was never formed or chartered.

A witness, (Mr. Grove), who was in the employ of the defendant company in 1890, testifies that he gave up his position with the company because its managers expected him to tell and to write things he knew were deceptions, and that Mr. Mott, of New York, the president of the so-called Ivanhoe Iron Co., wrote to Mr. Seeley, the secretary of the defendant company, to change the prospectus as to Ivanhoe Iron Co., so that his name should not appear in this connection so positively, before the public, as he did not understand it to be correct, and this statement was afterwards dropped from the advertisement of a sale of the defendant company's lots to take place Oct. 15, 1890; but the appellant had consummated his contract, as is admitted, on or about July 29, 1890.

With reference to the Ivanhoe Zinc Company, "with a capital of $500,000," represented to have "purchased immense deposits of valuable zinc ores," &c., the president of the defendant

company, over whose signature the advertisement exhibit "C" appeared, in his deposition taken in this cause, speaks of it as "a project" and says "that the zinc company had purchased no property at or near Ivanhoe, neither land, or zinc ores," but had bargained for, &c.,—deal not consummated." Yet the defendant company represented to appellant, through its agent and advertisements furnished the latter for use in inducing persons to buy the lots of the defendant company at fabulous prices, that the "Ivanhoe Iron Co." and the "Ivanhoe Zinc Co." were in existence, and the latter with large capital and property rights being developed at or near Ivanhoe, and the former organized for the purpose of erecting another furnace of large capacity, when in fact the first-named was but a myth, while the latter, if it ever had existence, even in contemplation, had not a dollar of subscribed capital, and never purchased or owned a foot of land, or a deposit of zinc ore at or near Ivanhoe, if indeed anywhere. These representations were also positive statements of existing facts, (not mere expressions of opinion), were material and well calculated to mislead, not only the plain mechanic that appellant is shown to be, but many others with far better advantages and more extensive business knowledge and experience than he, especially when made, as it appeared they were, by the authority of men represented to be of great wealth, of high character, and extensive business interest and experience.

It has been abundantly shown that they had no foundation whatever in fact, and however implicitly the officials of the defendant company making them or authorizing them to be made, under the influence of the excitement at the time, growing out of the mania for speculation then prevalent, believed in the future growth and development of Ivanhoe, and that all these advantages of railroad connections, mines, furnaces, manufactories and other industries, bringing with them a greatly increased population and immense capital, would materialize, and whereby Ivanhoe, a mere village at a station on a branch

of the Norfolk & Western R. R., would be converted into a city, a "great railroad centre," &c., the effect is the same as if the representations were made knowing them to be false. ✓

That the appellant was induced by these representations to enter into the contract he now asks to be rescinded, is not only an irresistible inference to be drawn from the character of the representations and the manner in which they were made, but is shown by a preponderance of evidence. He has never been to Ivanhoe, is a mechanic, and was, at the time of his purchase of these lots, pursuing his occupation in the city of Richmond, 300 miles from Ivanhoe. His statement is that he was alone induced by the representations made to him by the defendant company, through its agent, from whom he purchased. Without these representations, it is not to be believed from the facts shown that appellant would have made his purchase of the seven lots of a small fraction of an acre of land in each, at the price of over $300 a lot, when the real value of the land then and ever since was very little, if any, greater than other farming lands in the vicinity of Ivanhoe, and were assessed for taxation only at about $10 each.

True, the bill in this case was not filed until October, 1893, but, aside from the fact that the question of laches or ratification is not relied on as a defence, there is no ground whatever shown for a claim that the defendant company has been prejudiced by the delay of appellant in repudiating his contract, or that he has in any way ratified his contract after having been apprised of the falsity of the representations which induced him to enter into it. It appears that, as late as October, 1891, appellant was in correspondence with the defendant company about the payment of his notes, the president writing him of the progress of the company's developments, when all developments at Ivanhoe, practically, at least, had been abandoned many months before, if not as early as the fall of 1890. There is nothing to refute the statement of appellant that it was not until the summer of 1893, that he learned of the real condition of things at

Ivanhoe, and the true facts as to the advantages claimed for it in 1890, and there is no pretence that he in any way ratified his contract thereafter.

Whether a party seeking a rescission of his contract has forfeited his right to it, by laches or misconduct, depends upon the facts and circumstances of the particular case. If the rights of creditors have intervened, or an innocent third party has acquired an interest in the property, or if, in consequence of his delay, the position even of the wrongdoer is affected, a party seeking a rescission of his contract, on the ground of fraud, will be deemed to have waived his right to rescind. *Martin* v. *South Salem Land Co.*, 94 Va. 28; 2 Add. on Con., 772; *Hurt* v. *Miller*, p. 32. But there is nothing of the sort in this case. It is admitted that the defendant company has no creditors to be affected by a rescission of the contract. No attempt is made to show that the defendant company could have resold the lots had the appellant repudiated his contract sooner. On the contrary, it appears that a resale of the lots could not have been made after the lapse of a very short time, if at any time, subsequent to appellant's purchase. The attempted sale of lots October 15, 1890, proved to be a failure. The then president of the defendant company testifies that he bought some of the lots in 1890, and still had them when his deposition was taken. At the least, he does not say that he could have, at any time, made sale of them. Nor is there any proof of the resale of any of the lots purchased of the defendant company. It is clear, therefore, that not even the position of the defendant company has been affected by the delay of the appellant in bringing this suit, and that the parties may be placed in *statu quo*.

It follows that we are of opinion that the decree of the court below is erroneous and should be reversed, and this court will enter such decree as the court below should have entered, rescinding the contract of sale of the seven lots in question to appellant; cancelling his unpaid purchase money notes therefor, and the deed of trust securing them; directing the appellant to

reconvey the lots to the appellee, the Ivanhoe Land & Improvement Company, and decreeing that the latter pay to the former the sum of $733.32, with interest thereon from the 29th day of July, 1890, till paid, and the costs of this suit.

*Reversed.*