### HERRINGTON v. HODGES et al.

No. 3556. Decided April 20, 1921. Rehearing Denied May 24, 1921.
(197 Pac. 1035.)

VENDOR AND PURCHASER—EVIDENCE HELD NOT TO SHOW FRAUDULENT REPRESENTATION INDUCING PURCHASE OF LAND. In purchaser's suit to rescind farm land purchase for fraudulent representations as to the land and as to water rights, evidence *held* to support judgment for defendants.[1]

[1] *Ogden Valley Trout & Resort Co.* v. *Lewis*, 41 Utah, 183, 125 Pac. 687.

Appeal from District Court, Third District, Salt Lake County; *P. C. Evans*, Judge.

Action by C. E. Herrington against Ernest A. Hodges and others. From judgment for defendants, plaintiff appeals.

AFFIRMED.

*Chez & Barker* and *L. J. Holther*, all of Ogden, for appellant.

*Gustin, Gillette & Brayton*, of Salt Lake City, for respondents.

CORFMAN, C. J.

Plaintiff brought this suit to rescind a contract entered into between himself and the defendants for the purchase of 250 acres of farm lands in Elko county, Nev. The contract was in the form usually employed in such transactions, providing for payment by the plaintiff of the purchase price on the installment plan. The contract, together with a deed of conveyance of the lands, executed by the parties was placed with the Bettilyon Home Builders' Company of Salt Lake City to be delivered to plaintiff upon the full payment of the purchase price of the lands, $5,500. February 25, 1918, the date when the contract was entered into, the plaintiff, pursuant to the terms of said contract, made a cash payment of $2,000 on the purchase price, and the following March moved upon the lands and proceeded to put the same to crops. In May of the same year plaintiff vacated the premises, came to Salt Lake City, and in June following commenced this action against the defendant to rescind the contract and for the recovery of the $2,000 theretofore paid by him, on the grounds of fraud and misrepresentation practiced upon him by defendants in selling him the lands.

It is alleged in the complaint that the defendants, to in-

duce plaintiff to make said purchase, falsely and fraudulently made to him the following statements:

"(a)   That there were 225 acres of land in cultivation and under the plow; (b) that there were 20 acres in alfalfa; (c) that there were 25 acres in meadow, consisting of timothy and red top; (d) that some of the land was in grain; (e) that all of the above land was first-class, No. 1 soil; (f) that there was a water right belonging to said land containing an abundance of water for the irrigation of the 225 acres, and that abundance of water could be obtained for the remainder of 15 acres if application were made therefor."

The answer of the defendants denied the making of the representations attributed to them by the complaint, and, as an affirmative defense, alleged:

"That plaintiff purchased said premises from said defendants with full knowledge or the means of knowledge of all of the conditions surrounding said land obtained by said plaintiff from a personal examination of said premises and from knowledge and information obtained from other persons than these defendants, and not because of any representations of any kind or nature whatsoever made by these defendants or either of them."

The trial court found the issues in defendant's favor, and judgment was entered accordingly. Plaintiff appeals. He assigns as error and relies upon the following for a reversal of the judgment: The rejection of certain testimony offered in plaintiff's behalf at the trial, that the trial court's findings of fact, conclusions of law, and judgment are not sustained by the evidence, and that the conclusions of law and judgment are contrary to law.

It appears that the plaintiff was a resident of Ogden, and had, for some years before entering into the agreement for purchase of the lands in question, been engaged in farming in Box Elder county, Utah. The land had been listed for sale with the Bettilyon Home Builders' Company and advertised in Salt Lake City newspapers. The plaintiff and the defendant Ernest A. Hodges first met about February 7, at the office of the Bettilyon Home Builders' Company, and engaged in conversation concerning the land. During the course of the conversation defendant exhibited to the plaintiff a certain cultural map made by one C. B. McBride, an

engineer, representing that in 1912 certain portions of the land at that time were in grain and alfalfa, and other portions were being used as pasture and meadows lands. The plaintiff testified concerning the map and the conversation with the defendant about the water rights belonging to the land, and that the defendant represented that the lands were cropped as represented by the map and substantially the same as alleged in the complaint. He also testified that the defendant, upon that and other occasions before the contract was executed, made similar representations as to the crops, and that the land "had a No. 1 water right"; that "the water right was perfect."

The defendant Ernest A. Hodges, in his own behalf, testified:

"I 'bought the ranch in question in January, 1918, from Mr. Hunter. I think it was about the middle of January. At that time I visited the ranch. It had some snow on the ground, probably an inch or an inch and a half. I was on the land about 30 minutes. I never saw the ranch except that one time and the time I went out with Mr. Herrington. I first met Mr. Herrington in the office of the Bettilyon Home Builders' Company in Salt Lake City. I listed the ranch with the Bettilyon Company, and afterwards Mr. Curl called me up and asked me to meet Mr. Herrington in his office. This was about the 7th of February, 1918. I had a talk with Mr. Herrington and told him I was the owner of the ranch. I told him that I didn't know anything about the ranch and had only been out there once; that I had bought the ranch for my sons, but they had been enlisted in the army and I wanted to sell it. At that time I showed him a cultural map, Exhibit C. I also showed him the book of the abstract of water title by the state engineer, and I told him at that time that the cultural map showed all that I knew about the ranch. I told him that Mr. Hunter said it had a water right for 225 acres and opened up the book and showed him the abstract of claims at pages 135-136. I told him that Mr. Hunter knew all about this ranch, and that I would take him up and introduce him to Mr. Hunter. I never made any representations to Mr. Herrington except as shown by the cultural map. I never told him that there was any amount in cultivation. I never told him that there was any kind of crops on it. I didn't tell him that there was 20 or 25 acres in alfalfa, or any other amount. I never told him that there was 225 acres in cultivation. I didn't tell him that it was A No. 1 soil. We went out to see Mr. Hunter and met him on the sidewalk. I introduced

Mr. Herrington to Mr. Hunter. Mr. Hunter told Mr. Herrington that it had a good water right, and that it was the making of a dandy ranch, and Mr. Herrington and I agreed to go out and look at the ranch. Mr. Herrington suggested that we go out and look at the ranch. I met Mr. Herrington in Elko, and he stated that he guessed we couldn't trade. Mr. Herrington said he had met a friend here who told him that it was a dry farm. I said I was surprised at that, as Mr. Hunter had said it had a good water right. We then agreed to go out and look at the ranch the next morning. We got an automobile and got out and walked over the land. At that time he saw something that looked like salt grass to him, and he said, 'That is salt grass;' and I said 'Well, I don't know what kind of grass it is.' I said to him, 'Mr. Herrington, you know as much about this ranch now as I do;' and he said, 'Let's go and see a lawyer and look into the water,' I didn't point out to Mr. Herrington that any portion of it was in alfalfa, or in meadow, or in cultivation, or in grain. We went back to Elko, and I asked the clerk in the hotel who was the best attorney in town, and he told me that McNamara & Van Fleet were. We went up to their office, but they were too busy to see us and suggested that we go and see Mr. Dysart, which we did. I said, 'Mr. Herrington is figuring on buying the ranch from me out here and is questioning the water right.' I told him that I had only gotten the ranch very lately and didn't know a thing about it, and we wanted to get his opinion on the water right. I showed him the papers which have been introduced in evidence here, and after he looked them over Mr. Herrington asked him, 'Is that a perfect water right?' and he said, 'No, sir; there is no such thing in Elko county that I know of.' He said the water had not been adjudicated, and that we would never know how much water we had until the same was adjudicated; that he thought the adjudication would take place the next spring. We then left the office, and I asked Mr. Herrington, 'Do you want this ranch or don't you?' and he said he wanted the ranch."

William A. Curl, a witness for the plaintiff, testified:

"Mr. Herrington and Mr. Hodges were in my office about the 7th of February. Mr. Hodges told Mr. Herrington what he knew about the ranch. He said at that time he had only been the owner of the ranch for a few days and didn't know anything about it; that he didn't have much knowledge of the water right or anything else; that he had not made an examination himself of the water right, but was taking the word of Mr. Hunter for it. He stated at that time that he didn't know how much was in cultivation except as shown on the cultural map; that he had only been out to the ranch once, a few weeks before. The cultural map was shown by Mr. Hodges to illustrate the amount of land under cul-

tivation. He positively stated that all he knew about what was under cultivation was what was shown by this cultural map 'and what Mr. Hunter had told him. Mr. Hodges at that time suggested that they go and see Mr. Hunter."

W. G. Hunter, the former owner of the lands from whom the defendants had purchased, testified:

"I sold the land to Mr. Hodges in 1918. I met Mr. Herrington once on Second South 'and Main streets, Salt Lake City, some time in February, 1918. At that time I had a conversation with him in reference to this ranch. Mr. Hodges introduced me to Mr. Herrington and told me that Mr. Herrington was figuring on buying the ranch that he had purchased from me. Hodges said his boys had enlisted in the army and he was going to sell it, and that Mr. Herrington wanted to know something about the water rights to the place and that Hodges thought I knew more about it than he did, and he wished that I would tell him anything that I knew about it. I asked Mr. Herrington if Mr. Hodges had given him the papers in the case which showed the water right. I told him that the water rights in Nevada hadn't been adjudicated, but that the filings had all been made, and that the papers would show what water right he had. I told him that I believed the water rights were good. That is the only conversation I ever had with Mr. Herrington."

Other witnesses testified that in recent years the lands had not been cltivated and cropped, but had been used for pasturage practically without irrigation.

After the plaintiff had moved onto the land an attempt to use water for irrigation was made by him, and his right to do so was questioned by other claimants. What water rights, if any, there may be for the land, so far as the record before us is concerned, is left in doubt.

The plaintiff contends that the findings of the district court to the effect that defendants did not make the representations attributed to them by the allegations of the complaint cannot be sustained by the evidence in the case. Counsel makes the argument that the plaintiff was not only misled by oral representations made by the defendants as to the availability of the lands for farming, but that the cultural map exhibited by plaintiff was grossly false and misleading as to the true conditions. He has cited us to numerous authorities illustrative of the rule that, where property is at a distance, or

where, for any reason, the falsity of representations are not readily ascertainable, there is a distinction between that class of cases and those where lands are purchased by the vendee in the vicinity where he resides and the truth or falsity of the representations can readily be ascertained before purchasing. *Christensen* v. *Koch,* 85 Wash. 472, 148 Pac. 585; *Miranovitz* v. *Gee,* 163 Wis. 246, 157 N. W. 790; *Van Horn* v. *Chambers,* 49 Okl. 693, 154 Pac. 65; *Becker* v. *Clark,* 83 Wash. 37, 145 Pac. 65; *Haack* v. *Scott* (Iowa) 124 N. W. 1068; *Eichelberger* v. *Mills Land & Water Co.,* 9 Cal. App. 628, 100 Pac. 117. It is further argued and contended by the plaintiff that it is not material whether false representations in transactions of this character were known to be false by the party making them if the opposite party believed them and they constituted the inducement for his entering into the contract. *Grosh* v. *Ivanhoe Land & Imp. Co.,* 95 Va. 161, 27 S. E. 841; *Improvement Co.* v. *Brady,* 92 Va. 71, 22 S. E. 845; *Lowe* v. *Trundle,* 78 Va. 65; *Jeffreys* v. *Weekly,* 81 Or. 140, Ann. Cas. 1918D, 690, 158 Pac. 522; *Ogden Valley Trout & Resort Co.* v. *Lewis,* 41 Utah, 183, 125 Pac. 687. Many other cases are cited in plaintiff's brief in support of his contention that in transactions of the kind under consideration the vendor may not profit by his own false representations where the other party has been deceived and misled thereby.

No fault is to be found with the doctrine enunciated in the authorities cited by counsel. As we read the record in this case, the great weight of the evidence is against the contention that defendants made the representations charged by the allegations of the complaint. Nor did the trial court make the findings set forth on page 7, part 1, of plaintiff's brief, upon which the argument of counsel before this court for a reversal of the judgment seems to be wholly predicated. As a matter of fact the court expressly found that the defendants "made no false or fraudulent statements to the plaintiff to induce him to make said purchase, and that defendants did not falsely or fraudulently represent: (a) That there

were 225 acres of said land under the plow,'' etc.   Again, the court finds:

"That the plaintiff did not rely upon any representation made by said defendants, or either of them," and that "plaintiff purchased said premises from defendants with full knowledge or the means of knowledge of all the conditions surrounding said lands from a personal examination of said premises," etc.

It is true the testimony of plaintiff, standing alone, tends to disprove the facts found by the court, but, after carefully reading the record and giving the evidence due consideration, we are not prepared to say that the court's findings are not wholly sustained by the great weight of the evidence.   It is certain that the defendants were not familiar with the land.   If the many witnesses who testified at the trial are to be believed, the plaintiff was so advised.   Plaintiff visited the premises, viewed them, and was warned by the defendant after doing so that he knew just as much about them as defendant did.   Plaintiff was told by others that the lands were a ''dry farm,'' and again, after consulting an attorney, he was told that no water rights had been adjudicated, and therefore there was no such thing as a perfect right to them. It would seem, in the light of the testimony in this case, that plaintiff purchased with his eyes open, and if the lands were not of the kind or worth he anticipated them to be, it was his own voluntary conduct that led him into the contract of purchase.   The courts upon the showing made in this record, can afford him no relief for his not ascertaining the true character and condition of the property in the absence of misrepresentation or fraud on the part of the defendants. He should abide the consequences of his failure to exercise the prudence ordinarily to be expected of a vendee.   *Farnsworth* v. *Duffner*, 142 U. S. 43, 12 Sup. Ct. 164, 35 L. Ed. 931; *Clark* v. *Reeder*, 158 U. S. 505, 15 Sup. Ct. 849, 39 L. Ed. 1070; *Southern Development Co.* v. *Silva*, 125 U. S. 247, 8 Sup. Ct. 881, 31 L. Ed. 678.

We find no prejudicial error in the exclusion of testimony offered by plaintiff.   The findings of fact, conclusions of law, and judgment of the district court are amply sustained by

the evidence. It is therefore ordered that the judgment be affirmed, with costs.

WEBER, THURMAN, and FRICK, JJ., concur.

GIDEON, J. (concurring). This is an equity case. It is not only the right, but the duty, of this court to examine the record to determine the weight of the evidence. The only question presented is one of fact. I concur in the affirmance of the judgment solely on the ground that the other members of this court are agreed that the findings of the lower court are supported by the weight of the testimony. I have no hesitancy in saying that, if I followed my own views, after a somewhat careful reading of the record, I should arrive at a different conclusion. The testimony of the plaintiff is to a different state of facts than that claimed by defendant Hodges as shown by his testimony set out in the opinion of the Chief Justice. Every circumstance of initiating and consummating the contract between the parties, in my judgment, corroborates plaintiff's claim. The cultural map itself discounts to a very great extent much that defendant says in his testimony. Moreover, the plaintiff was buying this ranch for a home, and it is very improbable that he purchased it without some assurance as to the nature of the soil and as to what it would produce.