# CHARLESTON.

## E. M. SPANGLER *v.* T. L. JOHNSON *et al.*

### (No. 5202.)

Submitted March 17, 1925.          Decided March 24, 1925.

1. CORPORATIONS—*Bill to Rescind and Cancel Contract of Sale of Stock for Fraudulent Representations by Seller Held Good on Demurrer.*

   A bill in chancery for rescission and cancellation of a contract of sale of stock in a coal mining company on the ground of fraudulent representations on the part of the seller, which avers that defendants represented to plaintiff that the corporate assets consisted of a lease on 275 acres of coal land from ten acres of which the coal had been mined, together with equipment and personal property listed in writing, that such representations were false and were fraudulently and deceitfully made for the purpose of selling the stock, that he made the purchase relying upon such representations, all of which were false, that in fact the coal had previously been practicaly all mined and removed, and that the corporation did not own the equipment and personal property listed, and an offer to return the stock so sold upon rescission, is not demurrable. (p. 586).

   (Corporations, 14 C. J. § 1089.)

2. SAME—*Laches Do Not Preclude Rescission of Contract if Rights of Third Parties Have Not Intervened, or Wrongdoer's Rights Have Not Been Prejudiced.*

   Whether the person seeking cancellation of such contract has been barred from the remedy by laches or misconduct depends upon the circumstances. If the rights of creditors or innocent third parties have not intervened, or in consequence of the delay and conduct, the wrong-doer's rights have not been affected or prejudiced, generally it will not be held that he is precluded from invoking the equitable remedy of rescission. (p. 594).

   (Contracts, 13 C. J. § 670; Corporations, 14 C. J. § 1087.)

3. SAME—*Upon Rescission of Contract, Parties Must be Put in Statu Quo as Nearly as May Be; If Injured Party Cannot Make Full Restitution, Due to No Fault on His Part, and Substantial Justice Can be Done Without It, Rescission Will Be Allowed.*

   Upon rescission of such contract the parties must be placed in statu quo as near as may be, consistent with equity. If

inability of the injured party to make complete and full restitution is due to no fault on his part, and substantial justice can be done without it by the decree, rescission will be allowed. (p. 594.)

(Corporations, 14 C. J. § 1074.)

(NOTE:—Parenthetical references by Editors. C. J.—Cyc. Not part of syllabi.)

Appeal from Circuit Court, Kanawha County.

Suit by E. M. Spangler against T. L. Johnson and another. From decree for plaintiff, defendants appeal.

*Decree modified; cause remanded.*

*J. F. Cork* and *J. W. Kennedy,* for appellants.

*A. M. Belcher* and *M. F. Matheny* and *Joseph M. Crockett,* for appellee.

LIVELY, PRESIDENT:

Plaintiff, Spangler, asks for rescission and cancellation of a written contract with defendants, Johnson and Van Fleet, whereby he purchased from them the entire capital stock of the No. 2 Gas Coal Company, capitalized at $10,000. The ground for relief is fraud and misrepresentation. The decree granted the relief prayed for, and defendants Johnson and Van Fleet appeal.

The contract, dated Nov. 1, 1920, is between No. 2 Gas Coal Company, a corporation, and Johnson and Van Fleet as the vendors and Spangler as the vendee, and recites that the corporation is the owner of a certain leasehold estate on the Black Gem Mine on Campbells Creek, Kanawha County, and certain personal property situate thereon, said corporation having an authorized capital stock of $10,000, and that Johnson and Van Fleet are the owners of all the capital stock; that for the sum of $25,000, the stock is sold to and purchased by Spangler, the down payment to be $17,000.00 cash and the remainder in six and twelve months represented by two notes of $4,000, signed by Spangler, payable to Johnson and Van Fleet and secured by trust deed on the corporate property. The cash payments and notes and the stock of defendants represented by one certificate of $10,000, were to be

held by a bank for ten days in which examination of the title was to be made by Spangler, and if the title was found to be good and marketable, the money and notes were to be turned over to Johnson and Van Fleet and the stock turned over to Spangler. The possession of the property was delivered to Spangler on the day of the contract, the vendors agreeing to pay all indebtedness incurred by them up to that date. Mutual delivery of the down payment, notes, and stock, together with the corporate records was made Oct. 19, 1920. Plaintiff took possession of the leasehold and operated it until some time in May, 1921, or perhaps later, and according to his statement took out and sold about 3,750 tons of coal, at prices varying from $6.00 to $2.75 per ton, according to the market. He says he spent in operating the mine $8,000 more than he received for the coal. Plaintiff and defendants being strangers, were brought into communication through M. M. Tyree to whom the corporation, acting by Johnson, its president, had agreed in writing on October 6, 1920, to sell the property for $25.000, with cash payment of $17,000, and balance in notes at 6 and 12 months, secured by lien on the property. When this agreement to sell was executed to Tyree, Johnson and Van Fleet delivered to him a rough inventory of the corporate assets, in which the acreage of the leasehold was given as 275 acres, about 10 acres worked out, the minimum royalty to be paid the lessor $183.33 per month, the royalty being 40 cents per ton; the average of the seam of coal at 72 inches with a parting of 5 inches; the inventory also included an itemization of the personal property, such as boilers, hoist pumps, steel, tools and the like. Tyree assigned this agreement to Spangler, and sent him to defendants, resulting in the formal sale and purchase dated Nov. 1, 1920. Tyree was paid by Johnson and Van Fleet a commission of $2,000, out of the cash payment. Tyree made no examination of the leasehold or other assets of the corporation. He delivered the rough estimate of assets to Spangler.

The false and fraudulent representations on which plaintiff relies and on which he acted when making the purchase are: that the entire leasehold of 275 acres was underlaid with No.

2 Gas Seam Coal, with about 10 acres worked out; when, as a fact, all of the coal had been mined out except the pillars left to hold up the roof; that the machinery and personal property listed in the rough draft was owned by defendant corporation; when, in fact, it was owned by H. R. Wylie, the lessor, or at least the greater part thereof was so owned. These representations, plaintiff being a stranger to the property and never having been in the neighborhood prior to the purchase, relied upon. After he filed his bill he says, in his testimony, he has learned that the leasehold sold him lies in two parts: a 45-acre tract owned by Wylie; and a 230-acre tract leased by Campbells Creek Coal Company, and they are separated by other land not covered by the lease; that the two leases are about 1500 feet apart at their nearest point. He says that Johnson pointed out the boundaries of the lease and represented to him that they were contiguous tracts, when in fact there was the space of 1500 feet or more between the lease on which the tipple and opening were located and the other acreage owned by the Campbells Creek Coal Company, with no right to penetrate the intervening strata for the purpose of removing coal. No amended bill was filed. Defendants deny that they represented to him the acreage in the lease, the thickness of the seam, that they owned any of the articles of personal property listed in the rough draft, except two mules and harness, drill press and tools, Buffalo pump and a large amount of pipe, steel rails and various other smaller articles; but on the contrary, aver that plaintiff was fully informed in detail of all the equipment owned by them at the mine. They deny that they represented the quantity of coal in the lease, and not knowing how much coal had been mined out, upon Tyree's suggestion put into the inventory that ten acres had been worked out, which was a mere guess and not intended to be a representation. They further answer that Spangler went upon the leased property prior to his purchase and made a thorough investigation and examination of the mine and of the seam of coal therein and acted upon his independent knowledge thus gained, and that he operated the property for about twenty days before the cash payment was turned over to them and stated that he was thoroughly satis-

fied with the property; that they made no false representations to him, and that in January of the following year when they attempted to have him execute the deed of trust to secure the notes for balance of purchase money, then he stated that he had made a bad bargain, but would execute new notes which they could use, not then being ready to execute the deed of trust. They aver that it was only after the price for coal declined sharply that he began to invent excuses for avoiding his contract. They aver further upon information that some time in July, 1921, plaintiff surrendered the leases to the lessors, after he had robbed the mines, pulled the pillars therein and allowed the roof to fall, thus destroying the mine. They say that plaintiff after he had discovered that the property was not such as it had been represented to him (as he claims) continued to work the mine for his profit, and therefore is estopped from claiming cancellation on the alleged ground of fraud and misrepresentation; and that because he has surrendered the leases to the lessors and extracted large quantities of coal the status quo cannot be restored and he is estopped from cancellation and rescission. Plaintiff made general replication.

We now come to the evidence.

Spangler says that when he came to purchase the property with the Tyree contract and rough inventory in his possession, Johnson told him they had 275 acres of coal in the lease with probably eight or ten acres worked out; that the coal was No. 2 Gas Coal, the vein averaging from 66 to 72 inches in thickness with a parting of six inches; that the equipment listed belonged to defendants; that afterwards Wylie claimed the equipment, except the mules and some minor tools and machinery; that he has discovered since he began operating and at the time he sued that all of the coal on the 45-acre tract had been mined except the pillars which held up the roof; that the coal has all been mined from the other tract which he has discovered was not adjacent to the 45-acre tract on which the mine was located, but was separated therefrom by property owned by others, the separating strip being about 1500 feet wide; and that Johnson pointed out to him the property lines of the lease on the ground and stated that the

tracts were contiguous; that he was a stranger in that neigh-
borhood and went with Johnson to see the property, and re-
lied upon his representation; that Johnson took him in the
mine and showed him the face of the coal in five or six places;
that the coal looked solid and made a good appearance, but
that as a fact, (not known or discernible by him), the open-
ings were made in the middle of a pillar or pillars and driven
far enough to make it look as if the coal was solid in the
direction driven and on the sides; that the rooms had been
filled with slate and debris; that after driving through a
pillar, a room would be reached and then to get any more
coal, the room would be crossed, and another pillar would be
driven into; that Johnson showed him the equipment and
personalty at the mine listed in the rough inventory and
represented to him that the corporation owned it; afterwards
confirmed by Van Fleet when they returned from the inspec-
tion.  Rohring, who worked for the corporation and defend-
ants at the time of the sale, testified that Johnson, who was
in charge of the mine, had him to fix up the butt entries, and
drive two entries through a pillar so that it would show faces
of the coal, indicating a butt entry; that this was done in
October before the sale was made and that Johnson told him
there would be a man, a prospective purchaser, there in about
ten days to look at the mine, and for him to get the mine in a
nice condition.  He was instructed not to break through into
the rock fall so that anyone could see that it was not an entry.
He said that Johnson knew that the rock had fallen behind
the pillars and stated to him if he had known the mine had
caved in he would never have pumped the water out of it.
This witness says that practically all of the coal had been re-
moved: "a few little stumps standing here and there."  This
witness says he informed Van Fleet before the sale that there
was "only just a very small quantity of coal, a triangular
block driving up along the crop behind some houses."  He
says he told him "it wouldn't last but a very short time."
This witness says there was not enough coal in there to call
it a mine.  He was not with Johnson and Spangler when they
went into the mine to see the coal, and does not know what

part of the mine was shown. He says the condition of the mine was such that the extent of the coal could not be seen. He further says that the line of pillars left standing had broken the mountain and there had been a cave-in behind the pillars. Tyree details obtaining the sale agreement, and says that both Johnson and Van Fleet furnished him the rough inventory of the equipment to be included, Johnson representing that there had been only about ten acres of the 275 acres mined out; and that no mention was made to him that the 45-acre tract was separate from the other tract. Crichton, a mining engineer, testified that he made a survey of the property for Spangler in July, 1921, and that he was familiar with the coal on Campbells Creek; that practically all of the coal had been mined out of the 45-acre tract, and that it was nothing but a pillar proposition; this had been done by some other company some time previous; that there was a distance of from 1800 to 2000 feet between the 45-acre tract and the 230-acre tract; that there was no connection between them, and no tipple, or improvement of that character, on the 230-acre tract; that the Campbells Creek Coal Company had mined the 230-acre tract some years previous; that the value of the No. 2 Gas Coal Company's property had nothing more than a salvage value of the improvements on the property because there was nothing but pillars to extract, the cost of which was prohibitive. Its operation as a pillar proposition could not meet competition in normal markets. He was paid $691.65 for making the survey and map of the mine and leasehold by Spangler. For the defendants, Van Fleet and H. C. Zogg were examined. Johnson was not a witness. Van Fleet says that Johnson was the principal in making sale to Spangler; that they gave an option to purchase to Tyree, and the rough inventory was made without pretense of exactness; that they did not know how much coal was in the mine, and Tyree suggested that it be placed in the inventory as ten acres worked out; this was not a representation; that there was no representation made to Tyree that the two leases joined; that he never saw Spangler until October 20th after he had inspected the mine with either Johnson or Tyree, when they agreed on sale and terms. The witness further testified

that Tyree claimed a commission of $2,000 for making the sale.and it was paid by defendants out of the purchase money. He declined to tell Spangler what the commission was, the latter having learned that a commission was to be paid to Tyree. Possession of the mine was delivered to Spangler November 1, 1920, but the money was not taken out of escrow until Nov. 18th, awaiting consent of the Campbells Creek Coal Company to assignment of that coal lease, upon receipt of which Spangler was satisfied. He made no representations to Spangler whatever. He told him that the high prices of coal would not continue, when the purchase was made and Spangler said he knew it, and that he was familiar with the operation of coal mines. Spangler never made complaint until about February, when at a meeting at Kanawha Hotel he complained to him and Johnson that the mine was not as represented, but said he would continue to operate it, and would pay the notes. The first deferred payment was not then due. He said Spangler made much profit out of the coal mined at first, but toward the end of 1920 there was a decline in coal prices, which continued to decline until it became unprofitable to mine in many instances. In June or July, 1921, he was advised that Spangler had surrendered the lease on the 230 acres, which had never been operated by either of the parties. Spangler made no complaint except the statement that the mine had been misrepresented to him, made at the Kanawha Hotel meeting. In January or February, 1921, he prepared an option on the property from Spangler to Zogg. Spangler had never offered to return the property and had made no demand for return of the purchase money or notes, until he filed his suit. Zogg, an oil and gas producer, says he took an option on the property from Spangler in January, February or March, 1921, acting for a Mr. White, for $35,000.00 to the best of his recollection, for a period of about fifteen days, and examined the mine at that time. White did not call the option, and Spangler would not renew or extend it. Upon examination of the mine, he thought the price was reasonable. He was in the mine about one hour and a half, but says nothing about its condition or appearance.

The preponderance of the evidence supports the finding of

the lower court that Johnson represented to Spangler that the corporation had under lease about 275 acres of coal from which there had been mined about ten acres, and that the property was in two leases which joined; and that the equipment contained in the rough inventory was the property of the corporation. These were material representations, and not mere expressions of opinion, and were relied upon by Spangler. Whether they were falsely or innocently made is not important. *Grosh* v. *Ivanhoe Land Co.*, 95 Va. 161. The evidence of Rohring indicates strongly that Johnson knew this mine was a mere pillar proposition. He prepared it for sale by deception. His representation that the whole acreage was contiguous was an important and material one. Spangler did not inspect the 230-acre tract, and was naturally led to believe that he could take the coal out from the 45-acre tipple. He says he did not discover the falsity of this representation until Crichton made the survey. Johnson makes no denial. While Van Fleet denies that he made representations of either the leasehold or its contents and condition, he is bound by those made by Johnson who acted for him. He received one-half of the benefits of the deception.

Defendants assert that their demurrer should have been sustained, because the allegation of fraud is not sufficiently alleged; that it shows that plaintiff did not promptly disaffirm the contract upon discovery of the fraud practiced upon him; and that there is no offer in the bill to return the property and thus place the parties in statu quo.

The false and fraudulent representations set out in the bill are to the effect that defendants represented to plaintiff that the corporation owned and was selling to him a leasehold estate containing 275 acres of No. 2 Gas Coal from which about ten acres had been mined; and that it owned the personal property and equipment listed in an inventory prepared by them; and that relying upon these representations he purchased; that these representations were false, and falsely and fraudulently made, and he relied upon them. The bill is sufficient, and there was no error in overruling the demurrer. The bill offers to return the stock of the corporation. It was by virtue of the ownership of the stock that plaintiff took

possession. . There was no deed to or other formal transfer of title to the physical property of the corporation. The surrender and return of the stock is the surrender and return of all the property which is represented by it. Moreover, there is a respectable line of decisions to the effect that it is unnecessary for a plaintiff to offer to restore the status quo, because if he is entitled to relief, the court upon final hearing will compel him to do so, before decreeing in his favor. *Barker* v. *Walters,* 8 Beav. 92; *Jervis* v. *Berridge,* 8 Chy. App. Cas. 351.

The main point of error in the decree is that plaintiff is estopped from relief by rescission and cancellation, and hence from maintaining his bill, because after discovering the alleged fraud and false representations, he elected to continue the operation of the mine and did not promptly demand return of his money and offer to return the stock and property. Reliance is had upon *Coal Co.* v. *Hedrick,* 91 W. Va. 377 and *Jones* v. *McComas,* 92 W. Va. 596. In *Coal Company* v. *Hedrick* the plaintiff, which had purchased the stock of the mining operation and had operated the mine until all of the coal had been exhausted, then stripped the mine of all its equipment, sold the motor, track, houses, tipple, cars and all the other property, leaving the mine abandoned, and afterwards sued for rescission and offered a return of the stock. Rescission was denied because the parties could not be put in statu quo. In *Jones* v. *McComas* it was not shown that the representations alleged were no more than expressions of opinion from an inexperienced owner to a prudent, careful, successful and experienced coal operator who had spent many years in buying, selling, leasing and operating coal properties. He went upon the property with his experts and made an extended and careful investigation and was not hindered or deceived by the seller. Nothing was done to prevent full inquiry and investigation. He relied upon his personal investigation having equal means of information with the seller. The question of promptness in disclaiming the contract when the fraud was discovered did not there arise. The instant case is quite different from either of the cases cited and relied upon. The leasehold has not been dismantled. Plaintiff has not disposed

of the equipment. All that has been taken from the mine is the coal, much of which, if not quite all, was taken before discovery of the fraud. Can it be replaced in the mine? The law requires that the parties shall be placed in statu quo as near as may be under the circumstances. *Crosland* v. *Hall*, 33 N. J. Eq. 111; *Myrick* v. *Jacks*, 33 Ark. 425; *Baker* v. *Lever*, 67 N. Y. 304; *Gatling* v. *Newell*, 9 Ind. 572; Williston on Contracts, sec. 1530. Is plaintiff estopped because he did not promptly bring his action upon discovery of the fraud? When did he become fully aware that he had been defrauded? It is in evidence that about January, 1921, he refused to execute a deed of trust on the corporate property to secure the deferred payments for purchase money, or that he excused himself from doing so on the ground that he had made a bad bargain. Van Fleet says he then promised to pay the notes not yet due. He continued to mine, and on April 14, 1921, presented his bill to the court and obtained a restraining order to prevent defendants from negotiating the notes. Just when he became fully aware of the fraud does not appear. He suspected in the late winter or spring. In July, 1921, Crichton made a survey of the leasehold and coal therein by which he found that the leases were separated by from 1800 to 2000 feet, that there was no coal of commercial value in either tract, and that the pillars left were practically the only coal remaining and this could not be mined at a profit for sale on a normal market. Nor does it appear at what date Wiley claimed title to the equipment. It does appear that Spangler in the spring or late winter became suspicious that the representations made to him as to the acreage of coal and the ownership of the equipment were false. He then acted with reasonable promptness in bringing his suit. The bill filed was notice of his demand for rescission. Nor do we think he is barred because he did not quit the mine, and abandon it during the litigation. It was his duty to conserve the property as far as possible. Abandonment of possession is not a prerequisite. *Garner* v. *Leverett*, 32 Ala. 410. A defrauded party must elect whether he will affirm the fraudulent transaction or rescind it, but he cannot elect and is not required to act until he is aware of the fraud. The equitable remedy of rescission

must be invoked with reasonable promptness after the fraud is discovered. Lapse of time does not necessarily determine the right to rescind, the immediate consideration being whether the period has been long enough to result in prejudice to the other party. *Brown* v. *Young*, 62 Ind. App. 364; *Roberts* v. *James*, 83 N. J. L. 492, Anno. Cas. 1914 B. 859. What is a reasonable time depends on the circumstances of each case. The English courts hold that unless the situation of the opposite party has been changed to his detriment, the contract continues until the party defrauded elects to avoid it, and he may put off his election of remedies as long as he does nothing to affirm the contract. *Clough* v. *London*, L. R. 7 Ex. 26; *United Shoe Manufacturing Co.* v. *Brunet*, A. C. 330 (1909). Vol. 3 Elliott on Contracts, sec. 2431, says: ''It has been held that a suit in equity for cancellation must be brought within a reasonable time after discovery of the facts entitling the plaintiff to such relief. If the delay is unreasonable, and the adversary party has changed his position so that he can not be placed in statu quo, rescission will be denied. But an alteration in position not affecting substantial rights does not of itself prevent rescission. A number of opinions of eminent jurists would seem to excuse any delay less than the period of the statute of limitations which has not operated to the prejudice of the defendant. But relief by way of cancellation has been given regardless of unexplained delay on the plaintiff's part, amounting in some instances to several years.'' To the same effect is 6 R. C. L., sec. 317, page 935; 13 C. J. sec. 671, page 616; *Grosh* v. *Ivanhoe Land Company*, 95 Va. 161; *Engeman* v. *Taylor*, 46 W. Va. 669. The length of the delay in bringing the action after full and convincing discovery of the fraud, being uncertain, and from the nature of the case negligible, the acts done by plaintiff during that time would not affect injuriously the rights of defendants so far as the remedy of rescission is concerned. The lower court did not err in holding that plaintiff's right to rescind was not barred by laches.

The decree does not require plaintiff to restore to defendants the stock. It should do so. The parties should be placed in statu quo as far as it may be done. While it appears from

Crichton's evidence that the leases on both tracts are of ·no commercial value, (and there is. no evidence to the contrary), it does not appear what ·disposition if any has been made of such equipment as was on the leasehold belonging to defendants and to which they would be entitled upon rescission, such as mules, pumps, steel and tools. Nor is it shown what amount of coal tonnage was mined by plaintiff, at what prices sold, the costs of production or his profits or losses resulting from its operation. It is true, he says in a general way, that his expenditures exceeded his receipts by $8,000, and no accounting seems to have been demanded. The decree will be modified to the extent of requiring plaintiff to surrender to defendants the corporate stock of the No. 2 Gas Coal Company sold to him by them, and the cause will be remanded for an accounting of the personal property and equipment, and of the profits, if any, of the operation of the leasehold, if an accounting be desired by the parties. The appellee is the party substantially prevailing and will be awarded costs.

*Decree modified; cause remanded.* ·