# CHARLESTON.

H. C. JONES v. F. S. MCCOMAS *et al.*

Submitted November 21, 1922.     Decided December 15, 1922.

1.  CORPORATIONS—*Burden on Purchaser to Establish Fraud in Suit to Rescind and Cancel Sale of Stock.*

   In a suit to rescind and cancel a sale and purchase of shares of stock in a coal corporation on the ground that the purchaser was induced thereto by the false and fraudulent representations of the other as to the acreage, kind, quality and thickness of the seam of coal owned and operated by the corporation, the burden is upon the purchaser to establish the fact of such false and fraudulent representations, and that when the seller made them he knew them to be false, or made them recklessly and as positive assertions, and not as mere expressions of opinion; that he made them with the intention that they should be acted upon by the purchaser;

and that the purchaser believed them and acted and relied upon them, and that he thereby suffered injury. (p. 603).

2.  SAME—*Plaintiff Suing to Rescind and Cancel Sale of Stock for Fraud Must Make Out His Case by Preponderance of Evidence.*

In such a case, so long as the evidence leaves the scales evenly balanced, the defendant against whom the fraud is alleged must prevail, for the burden is upon the plaintiff to make out his case by a preponderance of the evidence. (p. 603).

3.  CONTRACTS—*False Representations Must be Susceptible of Approximately Accurate Knowledge.*

And always in cases seeking rescission and cancellation based upon alleged false and fraudulent representations of the defendant, it must appear that the representations were matters susceptible of approximately accurate knowledge on the part of the defendant, otherwise they should be regarded as expressions of opinion merely, which do not constitute proper bases for recission. (p. 603).

4.  SAME—*Things That Could Not be Expected to be Known Mere Expressions of Opinion, and Not Ground for Recission.*

Things a defendant could not be expected to know, should be regarded as mere expressions of opinion, and can not be regarded as the bases for recission of a contract. (p. 603).

5.  SALES—*Purchaser, Informing Himself from Other Sources, Deemed to Rely on Own Investigation.*

Though a purchaser may rely upon particular and positive representations of a seller, yet if he undertakes to inform himself from other sources as to matters easily ascertainable, by personal investigation, and the defendant has done nothing to prevent full inquiry, he will be deemed to have relied upon his own investigation and not upon the representations of the seller. (p. 610).

6.  CONTRACTS—*Parties to Contract with Equal Opportunities for Information Presumed to Rely on Own Judgment.*

And where both parties to a contract have equal means and opportunity to acquire information, so that by ordinary diligence either may rely on his own judgment, they will be presumed to have done so, and if not, they must abide by the consequences of their own folly or carelessness. (p. 610).

Appeal from Circuit Court, Kanawha County.

92 W. Va.

Suit by H. C. Jones against F. S. McComas and others. From a decree for defendant, plaintiff appeals.

*Affirmed.*

*S. B. Avis,* and *I. C. Jordan,* for appellant.
*Price, Smith, Spilman & Clay,* for appellees.

Miller, Judge:

The plaintiff, a coal operator of eighteen or more years experience, for grounds alleged in an original and an amended and supplemental bill sought, but by the decree appealed from was denied, rescission and cancellation of the sale by and purchase from the defendant F. S. McComas and others represented by him, in November 1920, of 466-2/3 shares of the stock of the Cap Run Coal Company, a corporation organized by McComas and others to take over and operate a coal property in Lewis County, consisting of a tract of 196½ acres owned in fee, known as the Reger tract, and of two other tracts, one containing 155 acres, known as the Crawford tract, and the other containing as alleged 426 acres, known as the Bennett tract, on which two tracts the said company had acquired operating leases.

The defendant McComas was a coal salesman with no experience in the ownership or operation of coal mines, but who in 1920, prior to the alleged sale to plaintiff, knowing of the many opportunities then being offered for fortune in the production and sale of coal, purchased the property in question and organized said company. Having offices in the same building and frequently having business transactions with plaintiff and his various coal companies, the subject of the acquisition by plaintiff of an interest in McComas's company was taken up between them, resulting in the purchase of the shares aforesaid. At the time of the contract the stock sold by McComas was held as follows: By F. S. McComas, 101-2/3 shares; by Minnie Lee McComas, 15 shares; by F. D. Barron, 172 shares; by W. E. Wright, 89 shares; and by S. G. Smith 89 shares. There were at the same time other shares outstanding, which McComas also represented, as follows: By M. C. Jennings, 130 shares; by Bartlett Conley, 10 shares;

and by E. L. Eitel, 60 shares. After Jones had personally inspected the property and agreed with McComas to buy the 466-2/3 shares, he sought out Jennings privately and purchased through him these 200 shares, giving him 666-2/3 shares in all, and absolute control of the company and its property.

The grounds for rescission and cancellation alleged in the original bill were that in order to induce plaintiff to purchase the 466-2/3 shares and to defraud him McComas knowingly and falsely represented to him:

First; that the said company owned in fee 196½ acres of the Pittsburgh No. 8 seam of coal, of the thickness of five feet and ten inches of clean coal; whereas said company owned not to exceed 20 acres of said Pittsburgh No. 8 seam, and that this acreage did not contain five feet and ten inches of clean coal with only one parting a quarter of an inch in thickness near the bottom, as represented, but in fact had two separate partings, containing four and six inches of bone coal respectively, all of which would have to be removed from the coal to make it merchantable and ready for shipment, and that in the greater part of said tract there was practically none of the Pittsburgh No. 8 seam, the same thinning down to as low as four inches.

Second; that said McComas, during said negotiations, had likewise knowingly and falsely represented that his company had spent in the neighborhood of $60,000.00 upon its operation, when in fact it had not spent one-third of that amount.

Third; that in consideration of the $70,000.00 which plaintiff undertook to pay for said stock, McComas as agent and trustee covenanted to forthwith pay all bills, notes and accounts payable and other indebtedness of said company, as shown by the contract entered into on November .., 1920, exhibit No. 1 with the bill, and had not done so as evidenced by the following: (a) that a suit had been instituted by C. C. Reger, Trustee, against said company to enforce payment of approximately $5,000.00, purchase money on the 196½ acres; (b) that as advised, the said Cap Run Coal Company, prior to plaintiff's purchase of said stock, had ex-

ecuted a deed of trust upon all of its property to secure the Indian Run Coal Company the payment of $40,000.00, of which plaintiff was ignorant; and as further advised, plaintiff alleged that said McComas had not paid off said indebtedness. And finally it was alleged that but for the false and fraudulent representations respecting the amount, character and value of said property, plaintiff would not have purchased the stock.

Defendants McComas and others answere dthe bill, McComas in his answer, among other things denying ignorance on the part of plaintiff of said purchase money lien, and denying that any suit was begun or threatened, and denying also ignorance on the part of plaintiff of said lien in favor of the Indian Run Coal Company, and tendered and filed releases of both liens showing full payment and discharge thereof.

In plaintiff's amended and supplemental bill, presented immediately on the filing of defendants' answers, and pending their motion to dissolve the preliminary injunction awarded him on his original bill, he makes the original bill a part thereof, but greatly modifies the material charges of false and fraudulent representations of McComas respecting the character, quantity and quality of the coal and other property of said company:

First; respecting the acreage of the coal, it is alleged that McComas not only falsely and fraudulently represented to plaintiff that said company owned in fee 196½ acres of the Pittsburgh No. 8 seam of coal, as alleged in the original bill, but that in addition thereto owned leases on two other tracts, the Bennett tract of 426 acres, and the Crawford tract of 155 acres, and that each of said tracts had thereon the same seam of coal as the 196½ acres, namely the Pittsburgh No. 8 seam, and of the same thickness, quality and character as that represented by him to exist on the 196½ acres, all of which representations were wholly false and untrue, and known to said McComas to be so; and furthermore that said property does not contain in fact a single acre of the Pittsburgh No. 8 seam of coal, but that the coal therein is what is known as

the "Elk Lick Coal," a coal of entirely different character and quality from the Pittsburgh No. 8 seam, and which is of poor quality, very dirty and with two partings of bone aggregating from seven to eight inches.

Second; that during said negotiations McComas furnished plaintiff with what he claimed was an analysis of the coal upon the Reger tract, showing among other contents, 5.82% of ash and 2.74% of sulphur, when in fact upon a proper analysis said coal was found to contain over 16% of ash and over .... of sulphur, which facts were known to McComas and were unknown to plaintiff.

Third; that pending said negotiations said coal company acting through McComas, had on October 20, 1920, executed to Bennett and others a deed conveying to them a right of way from the Bennett land over the Reger tract for the purpose of mining the coal from the Bennett land, and therein had also conveyed to said Bennett and others all the coal 300 feet each way of the main entry on the Reger tract and extending through the entire tract, containing approximately eleven acres, of all which plaintiff had no knowledge until after the institution of this suit, and in which deed the said McComas as president of said company described said coal as the "Elk Lick Coal," showing knowledge thereof by said McComas, but of which plaintiff remained ignorant, because the same was fraudulently and deceitfully concealed from him.

Fourth; that plaintiff now says that said land contained no merchantable coal other than the Elk Lick Coal; that because of the high percentage of ash and sulphur aforesaid and the general dirtiness thereof, it is impossible to operate the same profitably; that the Bennett lease provided for a minimum royalty of $2,500.00 per year, and the Crawford lease, which has no coal under it, for a minimum royalty of $1,-500.00 per year, rendering said property a liability rather than an asset, and absolutely worthless.

On the defendants' side, the answer of McComas individually and as agent and trustee, both to the original and amended and supplemental bills, adopted on information by

the others, in addition to the denials of certain allegations of the original bill, already referred to, denies that he at any time represented to plaintiff that the Reger tract contained 196½ acres of Pittsburgh No. 8 seam of coal, or that said Bennett and Crawford tracts, or either of them, contained the Pittsburgh No. 8 seam of coal, or that said two latter tracts contained coal of the same thickness, quality and character as existed under the 196½ acres, or that he claimed any knowledge thereof, but that he distinctly stated to said plaintiff and his associates that said company owned the coal in the Reger tract of 196-½ acres above the water line of Cap Run and had leases on the two other tracts of 155 acres and 426 acres respectively, and for which latter tracts the said company had the right and was entitled to mine the coal thereunder, and that he made no representation as to acreage or area of coal in either of said tracts.

The answer also denied all other material allegations of the bill. It is now conceded by counsel on both sides of the case that on pleadings and proofs the issues are narrowed and limited to the following questions:

(1) The alleged misrepresentation about the acreage of coal.

(2) The alleged misrepresentation about the identity of the seam of coal.

(3) The alleged misrepresentation about the thickness and partings in the seam.

(4) The alleged misrepresentation about the ash contents of the coal.

It is further conceded that the law applicable is that in order to prevail the plaintiff must bear the burden of showing by clear and decisive proof; (a) that the defendant made representations which were material, and that they were false; (b) that when he made them he knew they were false, or made them recklessly and as positive assertions, and not as mere opinions; (c) that he made them with the intention that they should be acted upon by plaintiff; (d) that plaintiff believed these representations and acted and relied upon them; (e) that plaintiff thereby suffered injury. Stated

with the same import but with varying phrase, these are the rules and principles established by all authorities, including our own decisions. *Houston* v. *McNeer,* 40 W. Va. 365, 370; *Wamsley* v. *Currence,* 25 W. Va. 543; *Southern Development Company* v. *Silvan,* 125 U. S. 247; 12 R. C. L. 240; 2 Pom. Eq. Jur. §888.

First, then did McComas falsely represent to Jones the acreage of coal? Jones by his original and amended and supplemental bills charges that McComas represented to him that his company had in each tract not merely the coal underlying the particular tracts mentioned, measured by the outcroppings, but 196½ acres of coal in fee in the Reger tract, 155 acres in the Crawford tract under lease, and 426 acres in the Bennett tract under lease. What McComas says he represented was that the company owned in fee and under lease the coal under these several tracts.

What are the facts? In his original bill Jones alleged no misrepresentation as to the acreage except as to the 196½ acre Reger tract. In his amended bill he includes the two other tracts under lease. Why did he not include them in his original bill? The omission could hardly be attributable to a bad memory or oversight of astute counsel. In his original bill he did not allege that the coal was not the Pittsburgh No. 8 seam, but that there was only about 20 acres all told of that seam. This fact is pertinent in this connection on the accuracy of plaintiff's memory and his good faith in his pleadings and testimony. To use Jones exact language on the witness stand: "He said: We own 196½ acres of the Pittsburg seam, and we have another tract of 155 acres adjoining, and we are negotiating for a boundary of 500 acres back of the other." He introduced several other witnesses, employees of his, who corroborated him as to McComas representations as to coal acreage in the 196½ acre tract. One of them, Kilburn, testified: "Q. How did he put it? A. Well, he was describing the property, what he had then, and he said they had 196½ acres of coal in fee, and went on describing and telling about his tipple and his tram roads and side tracks, steel rails, mine cars etc. Q. Did he tell you how much Cap

Run Coal Company had under lease? A. Yes, he mentioned his leases also. Q. State whether or not he gave Dr. Jones to understand that the same seam of coal was likewise under the leases held by the Cap Run Coal Company? A. He did. Q. Well, as near as you can do it, say what he said in that respect? A. Well, at first he said that before they had closed the negotiations on the Bennett lease, he said they had the Crawford lease, containing 155 acres, and that they had the tipple and side tracks on, which also contained coal, and later on when he was telling about the Bennett lease, after the negotiations had been closed, he told us the number of acres we had then, saying practically all of it was underlaid with coal—the same seam of coal.'' The two other witnesses, Lottie Graves and Beatrice M. Ruffner, stenographers in Jones' office, both testify as to the conversation heard between McComas and Jones, prior to the purchase by Jones of the stock, but neither seems to have heard any representations by McComas as to the coal acreage. The material parts of their testimony relate to the particular seam of coal to be later referred to. Another witness, Pettit, associated with Jones in business, testified on this subject, with seeming perturbation, as follows: ''Well, I heard him say that he had this boundary of coal, which was—had a certain— that is, in a mine a seam of coal of five feet ten inches—Clean —absolutely clean coal; that he had 196½ acres of coal in fee in the Pittsburg No. 8 seam; that there was some leased property besides, I don't remember—155 acres, I think; I am not positive. That was not as important in the statements as to the clean property, and the statement as to the height and the cleanness of the coal.'' McComas himself says: ''Q. Did you tell Dr. Jones how much coal you had in fee? A. I told him we owned the mineral under that Reger tract of land, that 196½ acres. Q. Well now, didn't you tell him that you had 196½ acres of Pittsburg No. 8 seam of coal? A. No, sir, that would be absurd, to make such a statement.'' Considering the allegations of the bill and the shifting of position in the amended bill, and this evidence of the witnesses on this one subject of the coal acreage, we are not con-

vinced that McComas said, or was understood by Jones and his witnesses as saying, that the Cap Run Coal Company had the actual number of acres of coal as alleged. That the company owned in fee and had under lease approximately the number of acres of land and owned or had the right to mine the coal thereunder is not contradicted. And, as McComas swears, it would have been absurd for him to have represented as a fact that he had in coal acreage, measured by the boundaries of the outcrop, the number of acres covered by the outside boundaries of the several tracts. We think we may judicially notice the fact, that unless specifically dealt with in that way, those dealing in coal lands generally when speaking of the acreage are understood to mean the acreage in the outside boundaries of the tracts owned or under lease and subject to mining rights and privileges. The fact that a map made by Burtnett, an engineer, was shown to Jones, and on which appears the legend, "Mineral Purchase 197 Acres," is relied on by him to sustain the theory of misrepresentation. It appears to have been made in part before Jones' purchase, and partly afterwards under the direction of Jones. A part of the original work was to run out the outcroppings of the coal on the 196½ acres, on the Cap Run side of the tract. The work done for Jones seems to have been the running out of the property lines. The suggestion of plaintiff's counsel is that the legend on the map was intended to deceive Dr. Jones into the belief that the whole of the 196½ acres was coal acreage. We are not impressed with this argument.

The most important perhaps of the alleged misrepresentations relates to the identity of the coal as the Pittsburg No. 8 seam. In his original bill Jones did not deny that the coal was of the Pittsburg seam; his complaint was that there was not to exceed 20 acres of that seam; it was in his amended and supplemental bill that he first charged that the coal was not of that seam, but of the Elk Lick seam, so-called. At the time he filed his original bill he had been in charge of the property, had operated it, and sold the coal, regarding it as of the Pittsburg seam, and perhaps marketing it as such; and

though he was an operator of many years experience, he had not discovered it to be other than the Pittsburg seam, until after he brought this suit, when it appeared in one of the deeds to the Bennetts that it was described as "Elk Lick Coal." Burtnett, a mining engineer, had indicated on his map the outcrop as being of the Pittsburg coal, not under any direction of McComas, but of his own volition and as expressive of his opinion as an expert mining engineer. McComas swears that Jones, hearing him talk of the Cap Run property, first broached the subject of becoming interested in the property, by iqnuiring what he had up there, and asked him what seam of coal they had, and that he answered that he considered it Pittsburg coal, that he never referred to the coal as the Elk Lick seam, because he understood the Elk Lick coal to be in fact another name for Pittsburg coal, and that it is not a fact that he told Dr. Jones it was the Pittsburg No. 8 seam of coal, except that he may have referred to it in general as Pittsburg No. 8, because it was talked about to him in that way. And when asked on the stand if he did not know that Dr. Jones was principally interested in the property because of his belief, from what he said, that it was Pittsburg coal, he answered, "No, sir," that it was that eight and nine dollar market that Dr. Jones was interested in. There is no doubt from this evidence and from the evidence of Dr. Jones and his other witnesses, that the coal was referred to during the course of the negotiations as the Pittsburg coal and the Pittsburg No. 8 seam. McComas does not deny this. But he says he was not a coal operator; that he referred to the coal by this description because so regarded and called locally by operators and by mining engineers and others; that he did so without intent to deceive or wrong Jones or any one else, but in good faith; and that when Jones asked him what he had there, he invited him to go and see for himself; and when he did go before purchasing, he rendered every aid within his power and urged him to the fullest investigation. And now, after all the evidence was taken and the cause submitted to the court for decree, the evidence not only of laymen examined on both

sides, but also that of the expert mining engineers, leaves the identity of the particular seam of coal still in doubt. Equally well informed and expert witnesses gave it different classifications. That it had numerous physical characteristics like the Pittsburg coal, such as vertical clay seams, all admit. The department of mines of the State, in reports, so classified it. It is true, the state geologist classified it as Elk Lick; but much evidence was introduced that he was not infallible, and had erred in other instances in classifying coal areas, which he had acknowledged. Under such conflicting views, is one to be accused of fraud and intentional wrong and wilful deceit in designating a seam of coal as of a particular strata, even though it might turn out that his opinion or designation was wrong? It is a very pertinent fact in this case, that after Jones had brought this suit and knew all about the facts disclosed by the record, he addressed a letter of authority to sell, to the witness Burtnett, describing the property, the acreage, the kind, quality and thickness of the coal, in the exact terms in which he alleges the property was described to him by McComas. He attempted to explain this as McComas's act and as reaffirmation of his alleged falsehoods. But this theory is not borne out by the evidence. These representations were made by him after he claimed to have discovered the actual facts in regard to the coal and the acreage thereof, and are more blamable perhaps, because McComas was not an expert and was not bound to know the apparently unknowable, when the doctors were in such a state of uncertainty, as the evidence discloses. It is well settled that one who alleges and relies on fraud as ground for rescission and cancellation must show the fact by clear, cogent and convincing evidence, and that as long as the scales remain evenly balanced, the defendant against whom fraud is alleged must prevail. *Pennybacker* v. *Laidley*, 33 W. Va. 624; *Board of Trustees* v. *Blair*, 45 W. Va. 812 821, and the numerous cases cited.

The alleged representation as to the identity of the seam of coal and the actual acreage involves the auxiliary question presented as to the persistency of the particular vein

throughout the tracts. Certainly, if one should represent to another that such a condition existed, the latter would be bound to know that it was expressive only of an opinion. To furnish grounds for an action for deceit, the representation must have been of a matter susceptible of approximately accurate knowledge on the part of the speaker. The mere expression of, an opinion, though fraudulently done, and on which the one addressed has no right to rely, will not constitute the basis for rescission. 20 Cyc. 17; 26 C. J. 1079-1080; *Cork* v. *Cook.* 56 W. Va. 51; 12 R. C. L. 245-246; *Southern Development Company* v. *Silva, supra, Johansson* v. *Stephanson,* 154 U. S. 625.

Of course the defendant McComas might be responsible for falsely representing the thickness of the seam and its quality and cleanliness, things he might be expected to know from mining and operating the property. *Osborne* v. *Holt,* 92 W. Va. decided at the present term. But how could he know the fact of the persistency of the coal throughout the whole acreage of the tracts involved? Things one is not expected to know should be regarded as mere expressions of opinion *Home Gas Co.* v. *Mannington Co-operative Glass Co.,* 63 W. Va. 266; *Cleavenger* v. *Sturm,* 59 W. Va. 658, 662; 2 Pom. Ep. Jur. (4th ed.), 1813.

Lastly, as to the ash content of the coal. The proof was that the analysis relied on was one presented after Jones purchased the stock. When so proven, Jones fell back on the claim that the contents of the written report had been communicated to him verbally by McComas before his purchase. McComas denies this. Moreover, the evidence shows that it makes all the difference in the world whether the test is made from a sample taken vertically through the entire seam of the coal or from a particular quantity of the coal mined and ready for market and with the impurities eliminated. Analyses made after suit by experts showed larger ash content than that shown by the analysis produced by McComas, but the difference, it is conceded, may be accounted for by the different methods and manner of selecting the coal for analysis.

But assuming that McComas made the alleged misrepresentation to Jones, this is not enough to grant the relief of rescission and cancellation. The law is, as both parties agree, that they must have been made of material matters of fact, that he knew them to be false, or the representations were made under such circumstances as imposed upon him the duty and obligation to know whether they were true, for the purpose of inducing plaintiff to act, and that plaintiff acted upon them to his damage. The court below evidently concluded that if made, plaintiff did not rely on the representations of McComas. In this conclusion we think the court was entirely justified by the evidence. As already noted, McComas swore that when asked what he had up there, he answered, go and see for yourself. And it is not contradicted that a day was set, and that Jones, Kilburn, his business associate, and McComas went together; that the two prospective purchasers were shown the mine, opened and in operation, with coal loaded and being loaded on the cars for the market; that they went into the mine; that their attention was called to the thickness of the seam as it appeared on the face of the working places, also to the partings therein; that Kilburn went with McComas upon the loaded coal and commented on its looks and quality; that the property lines were pointed out to them, and their attention called to the outcroppings of the coal on both sides of Cap Run; that their attention was called to the discoloration on the partings of the coal due to the presence of water in the mine. They were taken to the tipple; shown the tram ways and mine cars; and if anything was withheld from them by act or suggestion to prevent the freest and fullest investigation, it is certainly not shown by anything said or done on which Jones had the right to rely. They visited the several openings, one of them on the opposite side of Cap Run from the main entry on the other side, from which coal was being mined and loaded in wagons. As they went up the run, Jones could see, and no doubt did see, with open eyes that the coal was above the water line and did not exist except in the hills above the creek, and was not deceived by anything McComas may have

said, if anything, about the persistency of the coal under the whole tract or tracts. His contention is, that though he made the personal investigation, it was only casual; that his visit to the property was merely to find out what was needed by way of additional equipment to successfully operate the mine; and that he still relied on McComas's alleged misrepresentations. This contention is not consistent with the facts shown regarding the trip of inspection. He expressed himself satisfied with what he had seen. On the way home he gave an order for new mining equipment, and was seemingly anxious to acquire a greater interest in the property then originally contemplated, for he made haste to acquire from Jennings and others 200 additional shares, and having done so, he at once reorganized the directorate, and was elected president of the company, and took entire charge of the operation of the property, and expressed no dissatisfaction with his purchase, so far as the evidence shows, until there was a sudden drop in the market price of coal.

Two well established legal principles applicable to the main facts in the case, it seems to us, would bar plaintiff from relief by rescission and cancellation. The first is, that though one may rely on the particular representations of the seller, yet if he undertakes to inform himself from other sources, as by matter of personal investigation, and the seller has done nothing to prevent full inquiry, he will be deemed to have relied upon his own investigation rather than upon the representation of the seller. 20 Cyc. 32-33; 39 Cyc. 1293; 13 C. J. 391-392; *Cork* v. *Cook, supra; Southern Development Co.* v. *Silva, supra; Farrar* v. *Churchill,* 135 U. S. 609. Jones made no contract nor took any steps to conclude his purchase of the stock until he had made his own investigation of the property, and he expressed himself satisfied.

The other principle is that where the parties have equal means of information, so that with ordinary diligence or prudence either may rely on his own judgment, they are presumed to have done so, or if they have not done so, they must abide the consequences of their own folly or carelessness. *Lake* v. *Tyree,* (Va.), 19 S. E. 787; *Ludington* v. *Renick,* 7

W. Va. 273; *Camacia* v. *Iafollo,* 89 W. Va. 422. What advantages or means of information did McComas have over Jones? Jones undertook to investigate and inspect the property, and to verify any representations made to him by McComas. He saw the mine in operation, saw the seam of coal, its thickness, its partings, examined them, saw the lay of the land, and because of his greater experience as an operator was really better able to judge than McComas. Such being the case, he can not be decreed the relief prayed for.

Our conclusion, therefore, is to affirm the decree.

*Affirmed.*