483 S.E.2d 248

**Betty CORDIAL, Plaintiff and
Third Party Defendant
Below, Appellant,**

v.

**ERNST & YOUNG, et al., Defendants
and Third–Party Plaintiffs
Below, Appellee,**

v.

**Hanley CLARK, Third–Party Defendant
Below, Appellee.**

**No. 23088.**

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 16, 1996.

Decided Dec. 13, 1996.

Rudolph L. DiTrapano, Joshua I. Barrett, Debra L. Hamilton, Sean P. McGinley, Di-Trapano & Jackson, Charleston, for Plaintiff and Third–Party Defendant Below, Appellant.

John H. Tinney, Carl L. Fletcher, Jr., Spilman, Thomas & Battle, Charleston, James Hamilton, Michael L. Spafford, Swidler & Berlin, Washington, DC, Kathryn A. Oberly, Thomas L. Riesenberg, Ernst & Young, LLP, Washington, DC, for Defendants and Third–Party Plaintiffs Below, Appellees Ernst & Young, et al.

ALBRIGHT, Justice.

Appellant and plaintiff below, Betty Cordial, Deputy Receiver of Blue Cross and Blue Shield of West Virginia, appeals [1] a jury verdict entered in favor of Ernst & Young in an action for fraud, breach of contract, and negligent misrepresentation. We originally granted this appeal on the sole issue of whether the circuit court erred in giving Defendant's Instruction No. 73. Ms. Cordial complains that the instruction incorrectly stated the law as it related to the independent investigation exception to fraud. After briefs and oral argument, this Court broadened its grant of appeal to include all issues and requested supplemental briefs. We find reversible error, and, therefore, we reverse and remand this action for a new trial.

In July, 1987, the accounting firm of Ernst & Young ("E & Y") [2] was hired as an external auditor by Blue Cross and Blue Shield. [3] E & Y was to serve in this capacity during 1987, 1988, and 1989. E & Y's duties as external auditor included the preparation of audits performed according to "Generally Accepted Accounting Principles." This type of audit is commonly referred to a GAAP audit.

The provisions of W.Va.Code §§ 33–2–9 (1980) and 33–24–4 (1981) required the West Virginia Commissioner of Insurance "or his accredited examiners" to visit Blue Cross at least every four years and "thoroughly examine its financial condition and methods of doing business". The Commissioner was authorized by the statutes to appoint personnel who were not his employees to conduct such examinations, presumably as "accredited examiners". Appointed personnel were to be compensated by the Commissioner, and the insurer being examined was obligated to reimburse the State treasury for such compensation. Shortly after E & Y was hired by Blue Cross, E & Y was contacted by the Insurance Commissioner's office. The Insur-

1. The Honorable Arthur M. Recht resigned as Justice of the West Virginia Supreme Court of Appeals effective October 15, 1996. The Honorable Gaston Caperton, Governor of the State of West Virginia, appointed him Judge of the First Judicial Circuit on that same date. Pursuant to an administrative order entered by this Court on October 15, 1996, Judge Recht was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing October 15, 1996, and continuing until further order of this Court.

2. The accounting firm Ernst & Young resulted from the 1989 merger of the accounting firms Ernst & Whinney and Arthur Young. Although some of the incidents herein discussed occurred before the merger, we will refer the firm as "Ernst & Young" or "E & Y" throughout this opinion.

3. John Gianola, the director of audit for the Charleston office of E & Y, testified that E & Y was engaged to "audit [Blue Cross'] financial statements that were prepared in accordance with [ ] generally accepted accounting principles...." Ms. Cordial contends that the evidence presented at trial showed that E & Y performed financial services for Blue Cross beyond preparing financial statements. James Heaton, the former president of Blue Cross, testified that E & Y, upon his request, was also providing an "opinion relative to management controls and management's check[s] and balances, management procedures, [and] ... their opinion in as much detail as possible as to where they [felt] there [were] certain weaknesses within the Plan operations that we could take action on."

ance Department was interested in retaining E & Y's services to perform a W.Va.Code § 33–2–9 audit (the statutory audit) of Blue Cross and Blue Shield required for the year 1987, the last such audit of Blue Cross and Blue Shield having been performed in 1983. This type of audit has been, and is, commonly referred to as a "Statutory Accounting Principles" audit or SAP audit. Specific requirements for SAP audits vary from state to state but are controlled in West Virginia by the statutory provisions mentioned above and by Insurance Department regulations.

Hanley Clark, who is the current Insurance Commissioner, was the Deputy Insurance Commissioner at the time the discussions with E & Y were initiated. In the trial below, he testified that the Department decided to obtain an examiner outside the Insurance Department to do the statutory examination, because the Blue Cross system was very complex. He said that Blue Cross was the largest writer of health insurance in West Virginia, and none of the examiners on the Insurance Department's staff at that time had been the chief examiner in charge of an examination of Blue Cross. Mr. Clark stated that the Insurance Department was interested in engaging E & Y to perform the audit because the Insurance Department was already familiar with E & Y and some of its representatives, having worked with them on another project. In addition, E & Y had been recommended by the Illinois Insurance Department.

Commissioner Clark further testified that the West Virginia Insurance Department was aware that E & Y had already been hired by Blue Cross; however, the Insurance Department wanted a highly qualified accounting firm to handle the examination, and E & Y was the "number one accounting firm in the United States if not the world." Mr. Clark said at one point that the Insurance Department had difficulty in the past with its examinations being well received by Blue Cross. He said that E & Y was acceptable to Blue Cross, and E & Y was in a position to perform the examination in a more time effective and cost effective manner because of its familiarity with Blue Cross' finances.

On December 3, 1987, representatives from the Insurance Department, Blue Cross, and E & Y met to discuss the prospect of E & Y conducting the SAP audit. The record indicates that during the meeting there was a discussion regarding whether E & Y would be able to perform an unbiased and independent analysis of Blue Cross' financial condition, and E & Y made assurances that they would be able to perform an objective audit. Thereafter, E & Y was selected to perform the SAP audit. A letter memorandum dated January 6, 1988, on Ernst and Whinney stationery and addressed to the president of Blue Cross and Blue Shield, discloses the selection of E & Y.

The letter memorandum, introduced below as Plaintiff's Exhibit 13, recites that E & Y had been designated by Blue Cross to "act as independent certified public accountants to examine the financial statements of Blue Cross ... in accordance with generally accepted auditing standards". The letter then sets forth certain advice "[i]n connection with a request of the West Virginia Department of Insurance to have a statutory examination performed". Among the points included in that advice by E & Y was that E & Y was independent of Blue Cross and Blue Shield, that they were "aware of the provisions of the insurance statutes and regulations" of West Virginia "related to accounting and financial matters", that they would conduct the audit in accordance with generally accepted auditing standards and express their opinion "in conformity with accounting practices prescribed or otherwise permitted by the" Insurance Department, that "[i]n performance of this examination" the Insurance Department might "request that we perform additional agreed-upon procedures beyond those which are necessary for expression of an opinion on the financial statements", and that any "[s]uch procedures would be designed by the Department to accommodate its specific needs in fulfilling the requirements of a statutory examination". The memorandum advised also that, in the conduct of the examination, Blue Cross and Blue Shield management would be requested to give "written confirmation concerning oral representations made" to E & Y in "connection with the examination" and that the in-

surer's "claims forecasting methodology and the resulting impact on rate renewals" would be reviewed. At its end, the letter recited that "[t]his letter is furnished solely for you to comply with the request of the West Virginia Department of Insurance to have a statutory examination" and that the letter did not restrict the authority of the Insurance Commissioner in any manner. The letter concludes with a request to sign and return the letter "to indicate that it is in accordance with your understanding of the arrangements for the scope of our work." The letter, as introduced into evidence, bears the apparent signature, in script, of "Ernst & Whinney", and shows "accepted", with the apparent signature of the president of Blue Cross and Blue Shield, and shows "approved", with the apparent signature of the Insurance Commissioner, then Fred E. Wright.

Apparently, E & Y proceeded to do the independent GAAP audit for which it had been retained by Blue Cross and Blue Shield but did not complete the statutory audit for the Insurance Department in the manner contemplated by the letter memorandum just described. The parties to this action disagree as to why the statutory audit (SAP) was not completed in the manner described in the letter memorandum, and the evidence on that point is in substantial conflict.

E & Y did submit an "auditor's report" to the Commissioner. This report was based on the 1987 Blue Cross and Blue Shield GAAP financial statements. Those 1987 financial statements, included with the auditor's report, disclosed that Blue Cross had suffered more than $22 million in net losses and showed that Blue Cross' liabilities exceeded its assets by $6.7 million. The report also included a "going concern" qualification. At trial, E & Y offered evidence that the "going concern" qualification was the most serious warning that an auditor could give to inform the users of the report that the audit client may fail. Moreover, John Gianola, a partner with E & Y, testified that Blue Cross and Blue Shield was not happy about the inclusion of the "going concern" qualification in the report, and that the National Blue Cross and Blue Shield Association chastised

E & Y for including it. Ms. Cordial, on the other hand, offered evidence tending to show that E & Y advised the Insurance Commissioner that a "going concern" qualification was nothing to be concerned about and that many Fortune 500 companies had received such warnings. Evidence was also adduced to show that the Commissioner and his staff simply did not understand the significance of the "going concern" qualification.

With respect to the failure of E & Y to complete the statutory audit in the manner contemplated by the letter memorandum dated January 6, 1988, Ms. Cordial adduced evidence tending to show that E & Y induced the Insurance Department to waive the statutory examination, or SAP audit, by advising the Insurance Commissioner or his staff that there would be only minimal differences between the GAAP audit performed by E & Y and the statutory examination required by law. Apparently consistent with this showing, E & Y offered evidence of a meeting between E & Y and the Insurance Department, at which the meeting participants concluded that the SAP statements would be substantially similar to the GAAP statements. In effect, E & Y contends that, as a result of that meeting, the Insurance Department elected to treat the GAAP audit and statements as being substantially identical to a SAP for the year 1987. E & Y subsequently issued its auditors' report containing the 1987 GAAP statements, the "going concern" qualification, and a statement reciting that, based upon the Insurance Department's decision, the financial statements presented on the statutory bases were the same as those presented on the GAAP basis.

Ms. Cordial also presented evidence at trial that at a subsequent meeting to discuss E & Y's audit report and the 1987 financial statements, E & Y recommended to the Insurance Department that it do nothing regarding the losses reflected by the 1987 losses reflected by the financial statements and audit report. The evidence was that E & Y urged the Insurance Department at that time to give Blue Cross and Blue Shield time to turn its finances around. Ms. Cordial presented further evidence that E & Y failed to

include in their report certain information[4] which the experts who testified on Ms. Cordial's behalf considered to be necessary to conform with generally accepted auditing principles.

E & Y also submitted to the Insurance Department, either directly or with or through Blue Cross and Blue Shield, forecasts of the insurer's financial condition for 1988, 1989, and 1990. At trial, E & Y introduced evidence that the 1988 forecasts were prepared by Blue Cross and Blue Shield and that E & Y had then conducted an examination of those 1988 forecasts and expressed their opinion as to whether management's underlying assumptions provided a reasonable basis for the forecast. E & Y presented evidence that Blue Cross and Blue Shield also prepared the 1989 and 1990 forecasts. E & Y, the witnesses said, had simply prepared a compilation of them and had never expressed an opinion as to the underlying assumptions or otherwise regarding the reasonableness of those forecasts, but merely determined that the forecasts were not obviously inappropriate, given E & Y's knowledge of the existing circumstances. Ms. Cordial, on the other hand, presented evidence to show that E & Y independently prepared all of the forecasts and that the forecasts were derived from E & Y's work and assumptions.

The 1988 forecast, as first submitted, predicted a pre-tax net income loss of approximately $15.2 million, but predicted monthly operating profits for November and December of 1988.[5] Later, a revised 1988 forecast reduced the predicted net income losses to approximately $9.2 million.[6] However, the actual net loss suffered by Blue Cross for the year ended December 31, 1988, was approximately $19.7 million. The forecast first submitted for 1989 predicted a pre-tax net income profit of approximately $5.9 million. That forecast was later revised upward to $6.8 million. However, Blue Cross suffered a net loss of approximately $3.9 million for the year ended December 31, 1989. Three separate forecasts were submitted for 1990. The first forecast predicted a pre-tax net income profit of approximately $8.9 million. The second, presented in draft form, reduced the predicted income to approximately $600,-000.00. Finally, the third forecast, also submitted in draft form, predicted a net loss of $4.8 million.

On April 10, 1990, and prior to the issuance of the second 1990 forecast, the president of Blue Cross and Blue Shield, in accordance with W.Va.Code § 33–35–1, *et seq.*, notified the Commissioner that Blue Cross was impaired, as defined in W.Va.Code § 33–35–1. However, the Commissioner did not apply to the Circuit Court of Kanawha County for an order of liquidation against Blue Cross and Blue Shield until October 24, 1990.

At the trial, Commissioner Clark testified to the activities of E & Y in the interim between the submission of their 1987 audit report, apparently in April, 1988, and the commencement of the liquidation proceedings in October, 1990. In addition to its role in the submission of the forecasts just described, whatever that may actually have been, Commissioner Clark testified that during 1989 E & Y recommended to the Insurance Department that it monitor the operations of Blue Cross Blue Shield and give the insurer an opportunity to work through its cycle of losses. The Commissioner stated that E & Y discouraged him from instituting a liquidation or rehabilitation action against Blue Cross.

---

4. The report did not disclose the fact that in 1987 Blue Cross was placed on conditional membership status with the National Blue Cross and Blue Shield Association. In addition, the 1987 financial statement did not include information that Blue Cross had a premium deficiency of $5.8 million, which would have increased the reported net loss to approximately $28 million.

5. A letter accompanying the forecast and report indicated that they were prepared for the purpose of evaluating requested rate increases and should not be used for any other purpose.

Whether such use was intended to be equivalent to "a review of claims forecasting methodology and the resulting impact on rate renewal", as contracted for by the Commissioner and E & Y, is not clear from the record.

6. A letter accompanying this forecast stated that the forecast and the accompanying letter were intended to assist the Commissioner in the evaluation of Blue Cross' operations and should not be used for any other purpose.

The Commissioner testified further that, under the provisions of W.Va.Code § 33–10–3, as then enacted, the Insurance Commissioner could apply to a court to establish a receivership of an insurer by reason of the insurer's statutory insolvency, but that the law required that the Commissioner demonstrate to the court that receivership was warranted before the requested relief would be granted. Because W.Va.Code § 33–24–5(c) provided that an insurer was solvent if it had funds to pay its administrative expenses, and because the Commissioner expected that Blue Cross and Blue Shield would have fought any effort to place it into receivership, the Commissioner needed E & Y's backing to take such action. The Commissioner testified that E & Y would not agree to support liquidation or rehabilitation proceedings against Blue Cross and Blue Shield during this time. It may be noted that each of the forecasts for 1988, 1989, and 1990 originally predicted a profit for Blue Cross and Blue Shield after November, 1988. Although larger losses were actually suffered in both 1988 and 1989 than were predicted in either the original or revised forecasts for those years, the second forecast in 1989 actually increased the projected profit above the original 1989 forecast by about $900,000.00. In fact, the forecasts for 1988 were below actual net income results by a minimum of $10.5 million and those for 1989 were off a minimum of $9.8 million.

Faced with the reluctance of E & Y to support an application to the court for a receivership, either for rehabilitation or liquidation, the Insurance Department then contacted the National Blue Cross and Blue Shield Association and out-of-state partners of E & Y regarding the apparent insolvency of the insurer. E & Y ultimately agreed to cooperate with the Insurance Department in its prosecution of an application for a receivership. On October 26, 1990, two days after the Commissioner filed his application, the Circuit Court of Kanawha County entered its Order of Liquidation and Injunction. As required by W.Va.Code § 33–10–14 (1990), the circuit court appointed the Insurance Commissioner as receiver for Blue Cross and Blue Shield, and thereafter, the Commissioner, as permitted by that statute, appointed David Gates a special deputy commissioner to act as the receiver of the estate of Blue Cross and Blue Shield. Mr. Gates was assisted in the conduct of the liquidation by Ms. Betty Cordial. After Mr. Gates resigned, the Insurance Commissioner, in December, 1991, appointed Ms. Cordial as the special deputy commissioner to act as the receiver of the estate. It is in that capacity that Ms. Cordial is here as appellant and plaintiff below. Even after the order of liquidation, E & Y continued to perform tax services for the Estate of Blue Cross and Blue Shield.

In the summer of 1992, the Insurance Commissioner became aware of an internal E & Y memo, authored by Mr. Tom Finnell, an E & Y partner, and sent to Mr. Gianola, the E & Y partner in charge of the Blue Cross and Blue Shield account in West Virginia. Commissioner Clark testified that statements made in this memo caused him to suspect misconduct on the part of E & Y. Thereafter, the Commissioner and Special Deputy Commissioner Cordial entered into a tolling agreement with E & Y, postponing claims for or against the parties until at least November 25, 1992. By order dated November 30, 1992, the circuit court approved Commissioner Clark's application for authority to commence litigation against E & Y.

On December 3, 1992, this action was filed against E & Y, all of its individual partners and former partners, John B. Gianola and Paul Arbogast, both partners, and Robert J. Sylvester, a senior staff member. The action was brought by Commissioner Clark, in his official capacity as Insurance Commissioner and in his capacity as receiver for the estate of Blue Cross, and by Ms. Cordial, in her official capacity as Special Deputy Insurance Commissioner, and on behalf of all the claimants of the estate of Blue Cross and Blue Shield, and its creditors, policyholders, providers, members, subscribers, and the estate itself. The complaint alleged negligence, negligent misrepresentation, breach of fiduciary duty, conflict of interest, conspiracy, breach of contract, fraud, and tortious interference resulting from auditing and other professional services performed by the defendants for the West Virginia Department of Insurance and Blue Cross. The complaint

further alleged that defendants proximately caused damages to and/or the failure of Blue Cross and Blue Shield.[7]

By order entered May 17, 1994, the circuit court granted a motion to dismiss Commissioner Clark, both in his capacity as Insurance Commissioner and as receiver of Blue Cross, and to dismiss Ms. Cordial in her capacity as Special Deputy Insurance Commissioner. Thereafter, the complaint was amended to proceed solely in the name of Ms. Cordial, in her capacity as Deputy Receiver of Blue Cross, on behalf of all the claimants of the estate of Blue Cross, and its creditors, policyholders, providers, members, subscribers, and the estate itself. The amended complaint omitted a claim of tortious interference, but otherwise contained substantially the same allegations as the original complaint.

After a trial by jury, the verdict was returned finding E & Y zero percent negligent, finding the West Virginia Insurance Department, as regulator, fifty percent negligent, finding the former officers and directors of Blue Cross forty percent negligent, and finding the National Blue Cross and Blue Shield Association ten percent negligent. The verdict form also found that none of the other conduct of E & Y described therein proximately caused damage to Ms. Cordial. It appears that the case went to the jury on theories of professional negligence, negligent misrepresentation, fraud, and breach of contract. Ms. Cordial subsequently filed a motion for a new trial. It is from the trial court's order of November 1, 1994, denying her motion for a new trial, that Ms. Cordial now appeals.

### STANDING

 E & Y argues that Ms. Cordial lacked statutory authority to bring this lawsuit on behalf of creditors and policyholders. E & Y asserts that, under W.Va.Code § 33–10–14(b), Ms. Cordial, acting as receiver, can assert only those claims that the insurer, Blue Cross and Blue Shield, could itself have brought. Because the statute only authorizes claims that Blue Cross could bring, appellee contends, Ms. Cordial lacked standing to assert claims on behalf of Blue Cross creditors and policyholders. We disagree.

Under W.Va.Code § 33–27–10:

> Whenever it appears to the commissioner that any person has committed a violation of this article which so impairs the financial condition of a domestic insurer as to threaten insolvency or make the further transaction of business by it hazardous to its policyholders, creditors, shareholders or the public, then the commissioner may take possession of the property of such domestic insurer and proceed as provided in article ten [§ 33–10–1 et seq.] of this chapter.

West Virginia Code §§ 33–10–14(a) and (b) state, in relevant part:

> (a) Whenever under this article a receiver is to be appointed in delinquency proceedings for a domestic or alien insurer, the court *shall* appoint the insurance commissioner as such receiver. The court shall order the commissioner forthwith to take possession of the assets of the insurer and to administer the same under the orders of the court.

> (b) As domiciliary receiver, the commissioner shall be vested by operation of law with the title to all the property, contracts, and rights of action ... as of the date of entry of the order directing him to rehabilitate or liquidate a domestic insurer ... and he shall have the right to recover the same and reduce the same to possession.... (Emphasis added.)

We first note that subsection (a) of W.Va. Code § 33–10–14 states that "the court *shall* appoint the insurance commissioner as such receiver." We believe that this phrase makes it clear that the Insurance Commissioner is the receiver in cases such as this. As explained in the facts above, in the case *sub judice*, the Insurance Commissioner appointed Betty Cordial as deputy receiver in order to carry out his duties with regard to the receivership of Blue Cross. In the ca-

---

7. During the course of this case, E & Y filed two counterclaims and a third-party complaint against Commissioner Clark and Ms. Cordial, in their official and personal capacities. All of these claims were eventually dismissed and are *not relevant to this appeal*.

pacity of receiver, Ms. Cordial serves in a representative capacity and, in this instance, stands in the shoes of Blue Cross, the estate of Blue Cross, and its creditors, policyholders, providers, members, and subscribers.

We note further that this Court, while answering certified questions submitted by the United States District Court for the Southern District of West Virginia with regard to a case involving a suit brought by the Insurance Commissioner in his capacity as receiver, and brought under the authority of W.Va.Code § 33–10–14, cited with approval the ruling of the district court. This Court quoted a portion of the district court's ruling, which included a statement which indicated that "the Receiver is a governmental official charged with authority to protect *not only* the shareholders of the corporation, but also policyholders, creditors and the public." *Clark v. Milam*, 192 W.Va. 398, 404, 452 S.E.2d 714, 720 (1994) (quoting *Clark v. Milam*, 872 F.Supp. 307, 314 (S.D.W.Va.1994)). Moreover, the district court found that the language of W.Va.Code § 33–27–10:[8]

> [C]learly articulates the policy underpinnings for appointment of the Insurance Commissioner as receiver for an insurer. The appointment is not *solely* for the benefit of the corporation, but is for the more general benefit of "policyholders, creditors, shareholders or *the public* [.]" (emphasis added). Rather than being deemed to solely represent the interests of the corporation, the Insurance Commissioner *as Receiver* represents a broad array of interests, including those of the public.

*Clark v. Milam*, 872 F.Supp. 307, 311–12 n. 10 (S.D.W.Va.1994).

We have also considered a federal case where a receiver brought suit against accountants for an improper audit. *Resolution Trust Corporation v. KPMG Peat Marwick*, 845 F.Supp. 621 (N.D.Ill.1994). While there was no issue involving the receiver's stand-

ing, the *Resolution Trust* court discussed whether the receiver was subject to certain defenses which the accounting firm could assert against the bank in receivership. We find some of the court's comments instructive toward the standing issue herein addressed. The *Resolution Trust* court observed that " ' "[p]ublic policy concerns mandate a finding that the duty of FDIC to collect on assets of a failed institution runs to the public and not to the former officers and directors of the failed institution." ' [*FDIC v. Bierman*, 2 F.3d 1424, 1428 (7th Cir.1993)] (quoting *FDIC v. Greenwood*, 719 F.Supp. 749, 751 (C.D.Ill.1989))." *Id.* at 623. The *Resolution Trust* Court continued: "Self-evidently, it is the public which is the intended beneficiary of FSLIC, just as it is the public which is the beneficiary of the common law duty imposed upon officers and directors to manage properly the institutions entrusted to their care." *Id., quoting Bierman*, 2 F.3d at 1428 (other citations omitted).

■ Given the broad public interest in the sound administration of insurance firms, evidenced by the comprehensive scheme of insurance regulation found in W.Va.Code § 33–1–1, *et seq.*, it seems apparent that Ms. Cordial, as receiver, is carrying out a duty that runs to the public in pursuing the claims of "policyholders, creditors, shareholders or the public", as mentioned in *Clark v. Milam*, *supra.* Thus, we find that the Insurance Commissioner, while acting as receiver for an insurer, acts as the representative of interested parties, such as the defunct insurer, its policyholders, creditors, shareholders, and other affected members of the public, and any special deputy insurance commissioner appointed by the Commissioner for the purposes of carrying out his duties as receiver under W.Va.Code § 33–27–10, has standing, in their capacity as receiver, to bring an action such as this one to vindicate the rights of such interested parties.[9]

---

8. The court made this statement in the context of its discussion of the acceptance of the doctrine of adverse domination in West Virginia.

9. Appellee cites *Wheeling Dollar Savings & Trust Co. v. Hoffman*, 127 W.Va. 777, 782, 35 S.E.2d 84, 88 (1945), for the proposition that "[t]he rights of the respective receivers rise no higher

than those of the corporations which they represent." Appellee contends that it would have been able to assert defenses that should have led to the dismissal of this case if it had been brought by Blue Cross, because the knowledge of a corporation's officers and directors is imputed to the corporation itself. Appellee asserts that Blue Cross' managers indisputably knew what its

## CONFUSING AND MISLEADING CHARGE

Ms. Cordial complains that the charge given by the Court was confusing and misleading as a whole, compounded by specific portions of the charge which she claims were contrary to law. We agree and will therefore reverse.

" 'The formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.' Syl. pt. 6, *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995)"

Syl. pt. 6, *Voelker v. Frederick Business Properties,* 195 W.Va. 246, 465 S.E.2d 246 (1995).

We have reviewed the record and, most particularly, the record of the instructions tendered and given, the closing argument of counsel, and the verdict form used by the jury. Based upon our review, we do not believe that the jury was completely, clearly and correctly instructed on the law applicable to the facts. Furthermore, we find that the charge was particularly incorrect, misleading, and confusing on specific material issues. To articulate our reasons for this conclusion, we will touch serially on several important factors.

## FRAUD INSTRUCTIONS

### Fraud Generally

Ms. Cordial's pre-eminent claim of error is that by giving fraud instructions submitted by both sides in the case, the trial court incorrectly instructed the jury on the definition of fraud, and confused and misled the jury on that issue. The trial court gave the following instructions in its charge submitted by the two sides: First, the instruction offered by Ms. Cordial, given with minor modifications, stated:

The Court instructs the jury that if one represents as true what is really false, in such a way as to induce a reasonable person to believe it, and the representation is meant to be acted on, and he to whom the representation is made, believing it to be true, justifiably acts on it, and in consequence thereof sustains damage, there is such fraud as will support an action for deceit at law. Whether the representation is made innocently or knowingly, if acted on, the effect is the same. In the one case, the fraud is constructive; in the other, it is actual.

Then, in part, this instruction, offered by E & Y:

The Plaintiff has alleged that the Defendants committed fraud by intentionally making false statements or lying about the financial condition of the Blue Cross Plan to the Insurance Commissioner. The Court instructs the jury, that in order for the Plaintiff to prevail on her claim of fraud, she must prove each and every one of the following elements by clear and convincing evidence: That the Defendants made false statements to the Insurance Commissioner about the financial condition of the Blue Cross Plan; that when those false statements were made, the Defendants knew they were false, or they were reckless to the possibility that they were false; that the Defendants made those false statements with the intent that the Insurance Commissioner should act upon them; that the Insurance Commissioner justifiably relied upon those false statements; and that the Insurance Commissioner suffered injury that was proximately caused by the Defendants' false statements.

The essence of Ms. Cordial's complaint about these two instructions is that appellee's

---

financial condition was, and thus they could not bring a valid claim against E & Y for failure to disclose such. We note, however, that *Wheeling Dollar* was decided prior to the adoption of W.Va.Code § 33–10–14 in 1957. Thus, we do not find the case relevant to the issues at bar.

Moreover, since Commissioner, acting as receiver, is vindicating the rights of the public, including the Blue Cross creditors, policyholders, providers, members, and subscribers, we find no merit in this contention.

instruction, last quoted, advised the jury that it was necessary for Ms. Cordial to prove "that when those false statements were made, the defendants [appellees here] knew they were false", whereas Ms. Cordial's instruction correctly advised the jury that it was only necessary for the statements to be false and that a reasonable person would be induced to believe the statements to be true.

 We conclude that the overall effect of the instructions, as given, is indeed erroneous, but for reasons somewhat different than those argued by the parties. We believe that the definition of fraud contained in the second paragraph of Ms. Cordial's instruction correctly defines the tort of fraud under which money damages may be recovered in this State.

" 'The essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it.' Syl. Pt. 1, *Lengyel v. Lint,* 167 W.Va. 272, 280 S.E.2d 66 (1981)." Syllabus Point 2, *Muzelak v. King Chevrolet, Inc.,* 179 W.Va. 340, 368 S.E.2d 710 (1988).

Syl. pt. 2, *Bowling v. Ansted Chrysler–Plymouth–Dodge,* 188 W.Va. 468, 425 S.E.2d 144 (1992). Thus, by definition, fraud does not require in all circumstances that its perpetrator have actual knowledge of the material falsity of a statement. In *Horton v. Tyree,* 104 W.Va. 238, 139 S.E. 737 (1927), cited by us in the formulation of the *Lengyel* syllabus quoted in *Bowling,* we said with respect to fraud in inducement to a contract:

> Where one person induces another to enter into a contract by false representations, which he is in a situation to know, and which it is his duty to know, are untrue, he, in contemplation of law, does know the statements to be untrue, and, consequently, they are held to be fraudulent, and the person injured has a remedy for the loss sustained by an action for damages. It is not indispensable to a recovery that the defendant actually knew them to be false.

*Id.* at syl. pt. 1, 425 S.E.2d 144.

 Thus, it appears that Ms. Cordial's instruction quoted above catches the essence of *Horton,* though it also might have been more clear.[10] The coupling of that instruction with the instruction offered by E & Y, which contained language requiring that E & Y must have known those statements to be false *when they were made* may well have confused the jury and, in any event, the appellee's instruction does not contain an accurate statement of the law applicable to this case. We note further that appellees here are licensed professionals, who clearly have held themselves out to be possessed of special skill and knowledge with respect to the separate matters they undertook, on the one

---

**10.** Some of the confusion here may have arisen from the use of the term "constructive" or "constructive fraud". Constructive fraud is a term of art, grounded in the former equity practice and defined by this Court as follows:

> Constructive fraud is a breach of a legal or equitable duty, which, irrespective of moral guilt of the fraud feasor, the law declares fraudulent, because of its tendency to deceive others, to violate public or private confidence, or to injure public interests. *Miller v. Huntington & Ohio Bridge Co.,* 123 W.Va. 320, 15 S.E.2d 687 (1941). *See also, Steele v. Steele,* 295 F.Supp. 1266 (S.D.W.Va.1969); *Bowie v. Sorrell,* 113 F.Supp. 373 (W.D.Va.1953); *Loucks v. McCormick,* 198 Kan. 351, 424 P.2d 555 (1967); *Bank v. Board of Education of City of New York,* 305 N.Y. 119, 111 N.E.2d 238 (1953); *Braselton v. Nicolas & Morris,* 557 S.W.2d 187 (Tex.Civ.App.1977).

Perhaps the best definition of constructive fraud is that it exists in cases in which conduct, although not actually fraudulent, ought to be so treated, that is, in which conduct is a constructive or *quasi fraud,* which has all the actual consequences and legal effects of actual fraud. *In Re Arbuckle's Estate,* 98 Cal.App.2d 562, 220 P.2d 950 (1950). Constructive fraud does not require proof of fraudulent intent. The law indulges in an assumption of fraud for the protection of valuable social interests based upon an enforced concept of confidence, both public and private. *Perlberg v. Perlberg,* 18 Ohio St.2d 55, 247 N.E.2d 306 (1969).

*Stanley v. Sewell Coal Co.,* 169 W.Va. 72, 76–77, 285 S.E.2d 679, 683 (1981) (footnote omitted).

Our decision today is grounded not on the concept of "constructive fraud", but instead on this Court's definitions of fraud in the context of actions formerly at law, generally called tortious fraud.

hand, on behalf of Blue Cross and Blue Shield, and, on the other hand, for the Insurance Commissioner.

In answering a certified question in a negligence action, we held that "[i]n the absence of privity of contract, an accountant is liable for the negligent preparation of a financial report to those he knows will be receiving and relying on the report." Syllabus, *First National Bank of Bluefield v. Crawford*, 182 W.Va. 107, 386 S.E.2d 310 (1989). In the case before us, it appears that E & Y, in addition to being retained by Blue Cross and Blue Shield to conduct GAAP audit, contracted with the Insurance Commissioner to enter into his employment to provide the quadrennial statutory audit of the insurer. In the course of that employment, it appears that E & Y made certain representations to the Insurance Commissioner regarding the equivalence of the GAAP audit to the information required for the statutory audit and succeeded in substituting for the performance of that statutory audit a report based on its GAAP audit done for Blue Cross and Blue Shield. In particular, it should be noted that these events appear to have avoided the examination of claims forecasting methodology "by an experienced actuary", as contemplated in the course of the SAP. It further appears that E & Y participated in the submission to the Insurance Commissioner of various projections of income and profit or loss, with greater or lesser levels of review of those projections, in the exercise of their professional responsibilities to their clients.

In all of this course of dealings with two clients, there is some dispute about E & Y's functions, purposes, representations, and other conduct. There is no question, however, that in such circumstances Ms. Cordial was entitled to an instruction, tailored to this case, clearly advising the jury of the principles of *Horton* and clearly not limiting the jury to the consideration of representations E & Y knew to be false when made. At the times relevant to the instructions under consideration, E & Y was claiming independence of Blue Cross and Blue Shield, but were retained by it for certain other functions, related particularly to the review and transmittal of projections of income, profit, and loss, to which E & Y claims, at least in part, to have given limited attention. For at least a part of that same time, E & Y was employed by the Insurance Commissioner, as accredited examiners or to render advice and counsel regarding another client.[11] The record before us does not show that their employment by the Insurance Commissioner clothed them with authority independent of their status as "accredited examiners" or counselors. The water they were carrying

11. We have reviewed E & Y's contentions in opposition to the consideration by the Court of Ms. Cordial's assignment regarding constructive fraud, that (1) constructive fraud was not pled in the complaint, raised presumably in contemplation of Rule 9(b) of the West Virginia Rules of Civil Procedure, which provides that: "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"; (2) that courts do not permit money damages to be recovered by reason of constructive fraud, and (3) that constructive fraud requires a showing of a fiduciary relationship. We find the arguments to be without merit in the context of this case. We have reviewed the allegations of fraud in the complaint and find them sufficient to support the instructions to which we believe Ms. Cordial is entitled. While E & Y correctly cites cases holding that money damages may not be recovered at law for constructive fraud, we find those cases inapplicable to the case before us, where the fraud is within the definitions of tortious fraud adopted by this Court, and decline to further comment. Finally, with regard to fiduciary relationship, we find that here the relationships are governed more by the status of E & Y as independent certified public accountants, apparent counselors to Blue Cross and Blue Shield, contractors of specialized services to the Insurance Commissioner and counselor to him as the chief regulator of insurance in this State.

With respect to the bases for constructive fraud in former equity actions, we note that in *Miller v. Huntington & Ohio Bridge Co.*, 123 W.Va. 320, 15 S.E.2d 687 (1941), this Court stated, with regard to constructive fraud, that "[t]he term is made to include violations of public policy or public rights or transactions affected by illegal conduct of any kind. 1 Story Equity Juris. 349–351; 2 Pomeroy's Equity Juris.1931, Sections 922–931." *Id.* at 335, 15 S.E.2d at 695. More recently, the United States Fourth Circuit Court of Appeals, citing *Miller*, explained that "constructive fraud is generally reserved for those cases where a fiduciary relationship exists between the parties or the fraud violates an important public policy concern." *White v. National Steel Corp.*, 938 F.2d 474 (4th Cir.1991), *cert. denied*, 502 U.S. 974, 112 S.Ct. 454, 116 L.Ed.2d 471 (1991).

appears to spill, not just over two shoulders, but elsewhere as well.

### Reliance

Ms. Cordial also submits that a necessary element of two of her causes of action—fraud and negligent misrepresentation [12]—is reliance by the Insurance Commissioner, in his regulatory role, on the representations of E & Y. Ms. Cordial argues that the portion of Defendants' Instruction No. 73, which was related to the independent investigation exception to the element of reliance, was an incorrect statement of the law. The part of the instruction, as read to the jury, stated:

> [Y]ou are instructed that if you find that the Insurance Commissioner made an independent investigation of the facts that the Plaintiff alleges the Defendants made false statements about, you should find that the Insurance Commissioner relied on his own knowledge and not the information provided by the Defendants, and may find in favor of the Defendants on that claim.

▆ Ms. Cordial contends that, while the law does allow a presumption of nonreliance in certain contexts, the instruction given by the trial court ignored several essential prerequisites to such a presumption.[13]

▆ This Court adopted the independent investigation doctrine in syllabus point 5 of *Jones v. McComas,* 92 W.Va. 596, 115 S.E. 456 (1922), wherein the Court held:

> Though a purchaser may rely upon particular and positive representations of a seller, yet if he undertakes to inform himself from other sources as to matters easily ascertainable, by personal investigation, and the defendant has done nothing to

prevent full inquiry, he will be deemed to have relied upon his own investigation and not upon the representations of the seller.

The holding was reaffirmed more recently in *Eblin v. Coldwell Banker Res. Affiliates,* 193 W.Va. 215, 219, 455 S.E.2d 774, 778 (1995) (per curiam); and *Rockley Manor v. Strimbeck,* 181 W.Va. 313, 315, 382 S.E.2d 507, 509 (1989) (per curiam). We believe the standard adopted in *Jones v. McComas* is not an absolute and that proper instruction on the independent investigation doctrine requires the recital of a long recognized qualification. In syllabus point 3 of *Horton v. Tyree,* 104 W.Va. 238, 139 S.E. 737 (1927), we said:

> It is not necessary that the fraudulent representations complained of should be the sole consideration or inducement moving the plaintiff. If the representations contributed to the formation of the conclusion in the plaintiff's mind, that is enough, although a written agreement, which was executed at the time of the purchase, to take plaintiff's stock at the end of 90 days at a certain price, also operated in bringing him to the same determination.

The view we expressed in *Horton* finds support elsewhere. It has been recognized that:

> The mere fact, however, that some investigation is made by the representee is usually held, particularly in the late cases, not to amount in and of itself to a bar to the right to rely upon representations. The representee who attempts investigation may have a right to rely upon the representations where expert knowledge is necessary to an effectual investigation, which knowledge is possessed by the party making the

---

12. "In the absence of privity of contract, an accountant is liable for the negligent preparation of a financial report only to those he knows will be receiving and relying on the report." Syllabus, *First Nat. Bank of Bluefield v. Crawford,* 182 W.Va. 107, 386 S.E.2d 310 (1989).

13. The parties in this case originally submitted their instructions to the court in writing. Subsequently, each party tendered written objections regarding such instructions. We have reviewed the written objection submitted by Ms. Cordial

with regard to Plaintiff's Instruction No. 73, and find that it is sufficient to preserve this error.

"The purpose of requiring a specific objection in this instance is to bring into focus the precise nature of the alleged errors so the trial court is afforded an opportunity to correct them." *Earp v. Vanderpool,* 160 W.Va. 113, 120, 232 S.E.2d 513, 517 (1976) (citations omitted). We believe the written objection provided the court with the precise nature of the alleged errors, thereby affording it the opportunity to correct them.

representations, and not by the other. Moreover, if the representee, instead of investigating as fully as he may, makes only a partial investigation and relies in part upon such investigation and in part upon the representations of the adverse party, and is deceived by such representations to his injury, it is held that he has a right to rely on, and may maintain an action for, such deceit. This rule is particularly applicable where the representations were designed to deter further investigation. Furthermore, the fact that one makes an examination or inquiries does not necessarily show that he did not rely on the false representations of the other party.

37 Am.Jur.2d, *Fraud and Deceit,* § 237 (1968) (footnotes omitted). West Virginia law appears to be in accord with this view. *Accord Lengyel v. Lint,* 167 W.Va. 272, 277, 280 S.E.2d 66, 69 (1981).

■ While it appears that there is some conflict in the evidence on the matter of investigation, the Insurance Department maintains that the E & Y audit and representations were inseparable components of the Commissioner's investigation of the condition of Blue Cross and Blue Shield, although it admits to some independent inquiry into the facts related to the finances of the insurer. According to Defendants' Instruction No. 73, any finding that the Commissioner performed even the most cursory investigation required that the jury find that the Commissioner relied on his own findings. This is clearly not the intention of the investigation rule nor does it acknowledge the role of E & Y, while employed by Blue Cross and Blue Shield, in preparing or reviewing information to be supplied to the Commissioner or the role of E & Y as "accredited examiners" in the employment of the Insurance Commissioner and serving as counselor to both.

■ Consequently, we find that the instructions we have discussed, relating to the elements of fraud, and Defendants' Instruction No. 73, were incorrect, misleading, and confusing statements of the law. " ' "An er-

roneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." [Citations omitted.]' Syllabus Point 6, *Ratlief v. Yokum,* 167 W.Va. 779, 280 S.E.2d 584 (1981)." Syl. pt. 5, *Wheeler v. Murphy,* 192 W.Va. 325, 452 S.E.2d 416 (1994). "When a jury verdict is premised upon an erroneous conclusion of law by the trial court as stated in the judge's charge to the jury, it must be set aside." Syl. pt. 5, *State v. Morgan Stanley & Co., Inc.,* 194 W.Va. 163, 459 S.E.2d 906 (1995).

Ms. Cordial also contends that Defendants' Instruction No. 73 is binding and is therefore improper under *Blair v. Preece,* 180 W.Va. 501, 377 S.E.2d 493 (1988), *cert. denied,* 492 U.S. 923, 109 S.Ct. 3253, 106 L.Ed.2d 599 (1989), and *State v. Parks,* 161 W.Va. 511, 243 S.E.2d 848 (1978). Because we have already found the instruction was improper, it is not necessary to discuss this issue.

### Charge

Before proceeding to other errors assigned, we deem it appropriate to review the posture of the lawsuit as it was tried before the jury. The gist, if not an exhaustive recital, of this action is that appellants claim that appellees (defendants below) negligently performed certain services and, in doing so, made certain negligent misrepresentations and, as discussed, fraudulent representations, that such actions constituted a breach of the E & Y's contract with the Commissioner to conduct the SAP audit and render professional services to the Commissioner in aid of his public duty to regulate Blue Cross and Blue Shield, all of which caused the Commissioner not to take timely action to protect the defunct insurer, its policyholders, creditors, shareholders, and other affected members of the public from certain damages, for whom Ms. Cordial seeks recovery for the benefit of the defunct insurer's estate and its claimants. E & Y responds, as we understand their position, that they are independent auditors whose initial arrangements to serve the Commissioner were later altered or canceled. Furthermore, E & Y contends that no ser-

vices they provided were negligently rendered or constituted negligent misrepresentation or fraud, and that, in any event, all their representations were true or believed by them to be true. Finally, E & Y contends that the Insurance Commissioner did not rely on their representations, but relied on his own independent information, and that, consequently, no damages may be recovered against E & Y.

We do not minimize the difficulty of the task required of the trial court to adequately instruct in a case of this complexity, which was so vigorously litigated by all parties. In part, that complexity arose out of the dual roles of the Commissioner of Insurance in the facts and circumstances of this case, the role of Commissioner of Insurance, the chief regulator of the industry, and the role of statutorily designated receiver, who, in that capacity, was the representative of the estate of Blue Cross, and its creditors, policyholders, providers, members and subscribers. Three additional factors complicate the picture: (1) that the Commissioner, as regulator, was earlier a party to this proceeding, (2) that Ms. Cordial, although appearing in this action as the representative of the estate of Blue Cross, necessarily retains the title of Deputy Commissioner of Insurance, and, (3) much of the fact pattern underlying the action flows from E & Y's dealings with the Commissioner, in his capacity as regulator.

■ With that difficult task of instructing the jury in mind, and with the various legal theories on which the parties relied in mind, we have reviewed the remainder of the charge to the jury, and we find the following: In one part of the charge, regarding negligent misrepresentations, we note that the jury was told that in order for Ms. Cordial to recover, the jury must find "that the Insurance Commissioner suffered a financial loss that was proximately caused by the Defendants' false statements." In fact, the financial losses that had to be proven under that theory were losses by Ms. Cordial in her representative capacity of the estate of Blue Cross and Blue Shield and its claimants.

In a somewhat less egregious error, the jury was instructed that "the Insurance Commissioner must prove that he actually relied on" certain matters. Of course, it was incumbent on Ms. Cordial, not the Commissioner, to prove that the Insurance Commissioner had relied on such matters. Also, in the fraud instruction submitted by E & Y and reviewed above, the jury was instructed that Ms. Cordial must prove "that the Insurance Commissioner suffered injury" from the allegedly fraudulent statements. Of course, Ms. Cordial bore the burden of proving that the estate and its claimants suffered injury.

■ Next, we perceive that the portion of the charge relating to the definition of a contract and the facts related to that definition to be totally confusing. We believe that the evidence established beyond question, that E & Y entered into a contract with the Insurance Commissioner to perform the required statutory audit, of which it fully advised Blue Cross and Blue Shield in its letter memorandum described in this opinion and assented to by the Insurance Commissioner and Blue Cross and Blue Shield. If the charge undertook to instruct the jury on the subsequent revision or cancellation of that contract and the legal ramifications thereof, it fails totally. We believe that, if a contract theory is to be pursued, the parties are entitled to clear instructions relative to that theory as it may be thought to apply to the facts to be found by the jury.

■ The charge also contains a brief abstract instruction on concurrent negligence, but is utterly silent on the elements of comparative negligence, the parties whose concurrent negligence might be considered by the jury, or the effect of findings of particular percentages of fault. While the jury was left without any aid or direction on the supposed issue of comparative negligence, the verdict form found in the record permits the jury to assess comparative fault among six or more entities, which the jury then used to assess fifty percent fault to the "W.Va. Insurance Department as Regulator." We believe that if the evidence justified the determina-

tion by the jury of comparative fault with respect to some count or counts under consideration, a complete charge should have had appropriate instructions on that theory, indicating to what causes of action it was applicable.

The matters last discussed, in our view, simply confirm our earlier conclusion that the charge, as given, was indeed misleading and confusing in instructing the jury on the law to be applied to the facts. In addition to including the various theories of recovery and defense, we believe that any jury charge prepared for this case should endeavor to (1) properly identify the representative capacity and function of Ms. Cordial, (2) properly define and posit the separate theories of recovery and defense upon which the case is being tried by the jury, (3) clearly distinguish the role of the Insurance Commissioner as regulator, and (4) adequately instruct the jury on the multiple roles and duties of the appellees in their dealing with Blue Cross and Blue Shield and with the Insurance Commissioner.

We cannot discern that Ms. Cordial interjected timely and effective objections during the trial to each of the deficiencies we have identified, although objections clearly were preserved with respect to Plaintiff's Instruction No. 73.[14]

We are, however, persuaded that the deficiencies in the charge are sufficiently pervasive that error affects each of the theories under which the case went to the jury. In the absence of adequate objections, we look to whether the deficiencies to which we refer constitute plain error.

According to Rule 51, of the West Virginia Rules of Civil Procedure, "the court or any appellate court, may, in the interest of justice, notice plain error in the giving or refusal to give an instruction, whether or not it has been made the subject of objection." In *Earp v. Vanderpool,* 160 W.Va. 113, 121, 232 S.E.2d 513, 518 (1976), we cautioned that "[s]uch discretion must be exercised sparing-

ly and only in exceptional cases. Where the error not preserved is obvious and substantially affects the fairness and integrity of the trial proceeding, the interests of justice may mandate the exercise of this discretionary authority." In *Earp,* the trial court refused three of the six instructions submitted by the defendant, which were the only instructions submitted in the case. The defendants failed to object to the refusal. On appeal, this Court concluded in *Earp* that "[t]he record demonstrate[d] a complete omission of any instruction on the issues which were of vital importance to the defendants. In view of the relatively few instructions offered to the trial court for consideration and the detailed testimony on these issues at the trial, the omission is obvious to us and should have been obvious to the trial court."

Thereafter, in *Mollohan v. Black Rock Contracting, Inc.,* 160 W.Va. 446, 235 S.E.2d 813 (1977), this Court again discussed the plain error exception to the rule against appellate review of instructions to which objections were not properly entered. In *Mollohan* this Court, while recognizing the narrow application of the rule, commented "we cannot ignore the 'plain error' exception because our basic philosophy that lawyer errors should never be allowed to prejudice litigants' rights to fair trials demands that we have the opportunity to examine grossly erroneous trial court actions regarding instructions." *Id.* at 449, 235 S.E.2d at 815. The appellant in *Mollohan* complained that an instruction improperly used the word "repudiation," a legal word of art. The Court concluded that the use of the word was not plain error. *See also Edwards v. Mayes,* 385 F.2d 369 (4th Cir.1967); 1 Franklin D. Cleckley *Handbook on Evidence for West Virginia Lawyers,* § 1–7(B)(6)(b) (3rd ed.1994).

We believe that the jury charge, as a whole, was misleading and confusing to the extent that it substantially affected the fairness and integrity of the trial proceeding, and thus qualifies for the narrow application of the plain error doctrine in this regard.

14. *See* footnote 13.

This Court has recognized that "[t]o trigger application of the 'plain error doctrine', there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings." Syl. pt. 7, *State v. Miller*, 194 W.Va. 3, 459 S.E.2d 114 (1995).

■ We conclude that the courts failure to clearly instruct the jury on the correct law applicable to the complex facts of this case was plain error. Moreover, we conclude that such error affected the substantial rights of all the parties to a fair trial.

We conclude that the instructions, given as a whole, were inaccurate and unfair to both parties. Because we believe that the deficiencies in the charge reached every cause of action put before the jury, and because we find error with respect to the instructions on the elements of fraud and the requirements of the doctrine of reliance, we find that the court abused its discretion by giving such instructions. Consequently, we reverse the judgment of the Circuit Court of Kanawha County for the reasons stated, award a new trial, and remand the cause for proceedings consistent with this opinion.[15]

Reversed and remanded.

---

**15.** Ms. Cordial also assigns as error the introduction of a GAO report under Rule 803(8)(C) of the West Virginia Rules of Evidence. We find no error in its admission under that rule. On retrial, the issues raised by Rules 401 and 403, relating to relevancy and undue prejudice, will require examination if those issue are brought to the court. Ms. Cordial also assigns as error the failure of the trial court to rule or instruct on the existence of a conflict of interest. As we under-stand the record, there is no error in failing to instruct the jury that a separate cause of action exists in this State grounded on conflict of interest. We do note that Ms. Cordial failed to tender an instruction dealing with conflict of interest in terms of appellees' undertakings for the Commissioner and Blue Cross and Blue Shield or the subsequent alleged actions of appellees summarized in this opinion.